**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **MAURICE KENNEY,**<br>**QUINN MOORE,**<br>**MARY ZEISER,**<br>**PAULA BENNETT,**<br>**ARIANNA HICKS,**<br>**CHASE BUTLER,**<br>**PAULINA PROKHOROVA,**<br>**SUANN LOCKARD,**<br>**KIMBERLY CALLOWAY,**<br>**ANDREW AMREIN,** and<br>**ZOE KELLER,**<br>INDIVIDUALLY AND ON BEHALF OF ALL<br>OTHERS SIMILARLY SITUATED,<br>c/o Friedman Gilbert + Gerhardstein<br>441 Vine Street, Suite 3400<br>Cincinnati, Ohio 45202, | Case No.<br><br>Judge<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| vs. | |
| **CITY OF CINCINNATI,**<br>**MAYOR JOHN CRANLEY,**<br>**CITY MANAGER PATRICK DUHANEY**, and<br>**CINCINNATI POLICE CHIEF ELIOT ISAAC,**<br>c/o City of Cincinnati Law Department<br>801 Plum Street<br>Cincinnati, Ohio 45202, | |
| and | |
| **HAMILTON COUNTY, OHIO,** and the<br>**HAMILTON COUNTY BOARD OF**<br>**COMMISSIONERS,**<br>c/o Stephanie Summerow Dumas, President<br>138 East Court Street, Room 603<br>Cincinnati, OH 45202, | |
| and | |
| **HAMILTON COUNTY SHERIFF JIM NEIL,**<br>1000 Sycamore Street<br>Cincinnati, Ohio 45202 | |

1

and

**PSK KELLEY,**
**OFFICER MIKE HARPER,**
**OFFICER K. BEST,**
**PO CONDON (P329),**
**PO O'BRIEN,**
**PO DAVIS (P44),**
**PO B. ROCK,**
**PO K. HORNING (P917),**
**OFFICER DANIELS (P16),**
**PS B. SMITH (P517),**
**PO P. HERRMAN (P109),**
**OFFICER WHITE (P583),**
**PO HOLYFIELD (P159),**
**OFFICER J. GREENE (P35),**
**PO R. UTECHT (419),**
**PO JOHNSON (P219),**
**PO J. MENDOZA (P395),**
**PO KELSEY P425,** and
**OFFICERS JOHN DOE 1 THROUGH 1000,**
c/o City of Cincinnati Law Department
801 Plum Street
Cincinnati, Ohio 45202,

and

**OFFICERS JOHN ROE 1 THROUGH 450**,
1000 Sycamore Street
Cincinnati, Ohio 45202,

                              Defendants.

---

Plaintiffs Maurice Kenney, Quinn Moore, Mary Zeiser, Paula Bennett, Arianna Hicks, Chase Butler, Paulina Prokhorova, Suann Lockard, Kimberly Calloway, Andrew Amrein, and Zoe Keller, individually and on behalf of all others similarly situated, through counsel, for their complaint against Defendants City of Cincinnati, former Cincinnati Mayor John Cranley, former City Manager Patrick Duhaney, former Cincinnati Police

Chief Eliot Isaac, Hamilton County, Ohio and the Hamilton County Board of Commissioners, former Hamilton County Sheriff Jim Neil, Cincinnati Police Officers PSK Kelley, Officer Mike Harper, Officer K. Best, PO Condon (P329), PO O'Brien, PO Davis (P44), PO B. Rock, PO K. Horning (P917), Officer Daniels (P16), PS B. Smith (P517), PO P. Herrman (P109), Officer White (P583), PO Holyfield (P159), Officer J. Greene (P35), PO R. Utecht (419), PO Johnson (P219), PO J. Mendoza (P395), PO Kelsey (P425), Cincinnati Police Officers and Officer Agents John Does 1 through 1000, and HCSO/HCJC Officers and Officer Agents John Roes 1 through 450, allege as follows:

## INTRODUCTION

1.     On May 25, 2020, a Minneapolis police officer brutally murdered George Floyd, an unarmed Black man. Several months earlier, Louisville police had shot and killed Breonna Taylor, an unarmed Black woman, in her bed as she slept. Just a few weeks before the murder of Floyd, video emerged of the point-blank shooting of Ahmaud Arbery, who had been killed by three white men who, at the time, had not been charged with a crime despite video evidence of the murder.

2.     These murders exacerbated, reignited, and spread collective outrage at racism—and specifically racist policing and brutality. In the wake of Floyd's death, people across the country and around the world began demonstrating to demand justice and change. Innumerable people protested across the globe condemning police brutality and systemic racism in the wake of the state-sponsored and/or -sanctioned/-excused murders of George Floyd, Breonna Taylor, Ahmaud Arbery, Elijah McClain, Tony McDade, and countless others.

3.     Protestors also gathered together in Cincinnati in solidarity with this global movement. Demonstrations resounding with the refrain of Black Lives Matter began in Cincinnati on or about Friday, May 29, 2020. People gathered and demanded accountability

and change for police brutality and racism against Black people in the United States. On May 29, 30, 31, and June 1, 2020, through the daylight hours and into the night, people gathered at government buildings, in parks, and on streets and sidewalks, chanting, singing, carrying signs, and interacting among themselves, with passersby, and media.

4. The City of Cincinnati and Hamilton County responded in a manner reflective of precisely the deeply-rooted problems that were challenged by the protesters.

5. During this time, the City imposed an unconstitutional citywide nighttime curfew from May 30 through June 8, 2020 and arrested and prosecuted protestors, residents, visitors, and others for violating this curfew.

6. Officers, who often wore no badges or body cameras to identify themselves or record their misconduct, engaged in indiscriminate acts of violence and uses of force, and then corralled and trapped protesters, would not let them leave, and took them into custody. Officers swept up over 500 people in mass arrests.

7. The City, the Mayor, the City Manager, and the Chief of Police oversaw this conduct, which sought to silence the voices of people—who gathered to remind the world that Black Lives Matter and to call for an end to racism and brutality in policing—by responding with brutality, unlawful curfew orders, and unlawful arrests.

8. The City of Cincinnati and Hamilton County then confined those wrongfully arrested in abhorrent conditions, holding people for hours upon hours on buses and/or outdoors in the cold, without access to toilets, water, food, blankets or adequate clothing, shelter, necessary medication, and other basic human needs. While in custody, protesters were held in tight quarters, after Defendants removed their face masks, during the height of the early COVID-19 pandemic.

9. Ultimately, after approximately a year of wrongful prosecutions, the charges against these hundreds of people were finally dismissed.

10.    The City's and County's ruthless misconduct and abuse chilled the speech of protestors, and infringed on the rights of protestors, journalists, and bystanders to be free from unreasonable seizures and use of force.

11.    The purpose and effect of this misconduct and abuse was retaliation for, and was to prevent, deter, and suppress protestors from, exercising First Amendment rights to exercise freedom of speech, peaceably assemble, and petition for redress of grievances.

12.    Plaintiffs, on behalf of the Class and Subclasses named herein, now seek justice from this Court for the City's and County's wrongdoing, and to prevent such misconduct and abuse from continuing to silence their voices and the voices of others.

13.    Plaintiffs bring this action seeking an order from this Court restraining Defendants City of Cincinnati and Hamilton County from further suppression of speech, committing acts of violence, and other unconstitutional conduct and seeking damages on behalf of themselves individually and others similarly situated to them.

JURISDICTION AND VENUE

14.    This action arises under the laws of the United States, and subject matter jurisdiction is conferred on this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

15.    Venue is proper under 28 U.S.C. 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiffs' claims also occurred in this judicial district.

PARTIES

16.    Plaintiff **Maurice Kenney** ("Kenney") is an artist and performer and a resident of Cincinnati, Ohio.

5

17.     Plaintiff **Mary Zeiser** ("Zeiser") is a community organizer and currently a resident of Sacramento, California.  At the time of the events described in this Complaint, Zeiser was a resident of Cincinnati, Ohio.

18.     Plaintiff **Paula Bennett** ("Bennett") is a commercial painter and currently a resident of Amenia, New York.  At the time of the events described in this Complaint, Bennett was a resident of Cincinnati, Ohio.

19.     Plaintiff **Arianna Hicks** ("Hicks") is a case worker and a resident of Cincinnati, Ohio.

20.     Plaintiff **Chase Butler** ("Butler") is a food service worker and a resident of Cincinnati, Ohio.

21.     Plaintiff **Paulina Prokhorova** ("Prokhorova") is a food service worker and a resident of Cincinnati, Ohio.

22.     Plaintiff **Quinn Moore** ("Moore") is a firefighter EMT and a resident of Cincinnati, Ohio.

23.     Plaintiff **Suann Lockard** ("Lockard") is food service worker and a resident of Cincinnati, Ohio.

24.     Plaintiff **Andrew Amrein** ("Amrein") is project manager who works in advertising and a resident of Cincinnati, Ohio.

25.     Plaintiff **Kimberly Calloway** ("Calloway") is a former healthcare worker and resident of Cincinnati, Ohio.

26.     Plaintiff **Zoe Keller** ("Keller") is project manager in the construction industry and a resident of Chula Vista, California. At the time of the events described in this Complaint, Keller was a resident of Cincinnati, Ohio.

27.     Defendant **City of Cincinnati** ("City") is an Ohio political subdivision, duly organized under the laws of the State of Ohio, residing in the Southern District of Ohio. The Cincinnati Police Department ("CPD") is an agency of Defendant City, and all actions of the CPD are the legal responsibility of the City. Defendant City is a "person" under 42 U.S.C. § 1983. Defendant City is responsible for the policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

28.     Defendant **Hamilton County** ("County") is an Ohio political subdivision, duly organized under the laws of the State of Ohio, residing in the Southern District of Ohio. The Hamilton County Sheriff's Office ("HCSO") and Hamilton County Justice Center ("HCJC") are agencies of Defendant County, and all actions of the HCSD and HCJC are the legal responsibility of the County. Defendant County is a "person" under 42 U.S.C. § 1983. Defendant County is responsible for the policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

29.     Defendant Former **Mayor John Cranley** was at all relevant times the Mayor of the City of Cincinnati, acting within the scope of his employment and under the color of law. Defendant Cranley was a supervisor of all City of Cincinnati employees and agents whose conduct is at issue in this suit, and he is sued in his individual and official capacities. Cranley's term as mayor ended in January 2022.

30.     Defendant Former **City Manager Patrick Duhaney** was at all relevant times the City Manager of the City of Cincinnati, acting within the scope of his employment and under the color of law. Defendant Duhaney was a supervisor of all City of Cincinnati employees and agents whose conduct is at issue in this suit, and he is sued in his individual and official capacities. Duhaney's term as City Manager ended in July 2020.

31.     Defendant Former **Police Chief Eliot Isaac** was at all relevant times an employee and the Police Chief of the Cincinnati Police Department, acting within the scope

7

of his employment and under the color of law. Defendant Isaac was the supervisor of all Cincinnati Police Department employees and agents, including but not limited to John Does 1 through 1000, whose conduct is at issue in this suit, and he is sued in his individual and official capacities. Isaac retired from the position of Chief of Police in February, 2022.

32.     Defendant former **Sheriff Jim Neil** was at all relevant times an employee and the Sheriff of Hamilton County, acting within the scope of his employment and under the color of law. Defendant Neil was the supervisor of all Hamilton County Sheriff's Office and Hamilton County Justice Center employees and agents, including but not limited to John Roes 1 through 450, whose conduct is at issue in this suit, and he is sued in his individual and official capacities. Neil's term as sheriff ended in January, 2021.

33.     Defendants **PSK Kelley, Officer Mike Harper, Officer K. Best, PO Condon (P329), PO O'Brien, PO Davis (P44), PO B. Rock, PO K. Horning (P917), Officer Daniels (P16), PS B. Smith (P517), PO P. Herrman (P109), Officer White (P583), PO Holyfield (P159), Officer J. Greene (P35), PO R. Utecht (419), PO Johnson (P219), PO J. Mendoza (P395), PO Kelsey (P425)**, and **John Does 1 through 1000** (all Defendants named in this paragraph, collectively, "CPD Officer Defendants") are CPD officers and/or CPD officer agents.[1] They were acting within the scope of their employment and were on duty and/or present during the events described in this Complaint, committed constitutional violations against protestors and others nearby, and/or unlawfully arrested people and/or initiated prosecutions for alleged Curfew

_____

1 To the extent that Defendant City requested the assistance of other police agencies in responding to the protests, CPD supervisors, including but not limited to Chief Isaac, Mayor Cranley, and City Manager Duhaney, instructed those outside officer agents to follow and implement the CPD's "rules of engagement." Thus, the City was also responsible for the actions of members of its mutual-aid network, and at all times relevant hereto, John Does 1 through 1000 were the agents, servants, and/or employees of the Defendant City, and were acting at all times under color of law and within the scope of their agency or employment and with the knowledge and consent of their principal or employer.

violations in the City of Cincinnati between May 29, 2020 and June 8, 2020, and/or held arrested people in unconstitutional conditions of confinement. They are sued in their individual and official capacities.

34. Defendants **John Roes 1 through 450** are corrections officers and/or officer agents of Hamilton County and the HCSO. They were acting within the scope of their employment and were on duty and/or present at the Hamilton County Justice Center during the events described in this Complaint, and held arrested people in unconstitutional conditions of confinement. They are sued in their individual and official capacities.

35. At all times relevant to this Complaint, all Defendants were acting under color of state law.

36. Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto, Defendants, and each of them, were the agents, servants, and/or employees of the other Defendants and were acting at all times within the scope of their agency or employment and with the knowledge and consent of their principal or employer.

37. The acts and omissions of all Individual Defendants[2] were at all material times pursuant to the customs, policies, practices, and/or procedures of the Defendant City and CPD and/or Defendant County and HCSO and HCJC.

### FACTUAL BACKGROUND

38. In the wake of global outcry over racist policing and brutality in the United States described above, people in and near the Cincinnati area gathered to publicly protest and demand accountability and change and to stand together for the proposition that Black Lives Matter.

---

[2] The Individual Defendants include former Mayor John Cranley, former City Manager Patrick Duhaney, former CPD Chief Eliot Isaac, former Sheriff Jim Neil, the CPD Officer Defendants, and HCSO/HCJC officers/agents John Roes 1 through 450.

39.     At or around 5:00 p.m. on May 29, 2020, protestors gathered at the Hamilton County Courthouse, Cincinnati City Hall, Fountain Square, and other locations in downtown Cincinnati to protest police brutality and racism in the United States. Protestors carried signs, chanted, and knelt. Large numbers of people participated.

40.     In the days that followed, thousands of protestors assembled to demonstrate in Cincinnati every day.

41.     Protestors frequently assembled in one location to protest, but they also marched down streets, primarily in the downtown Cincinnati area, and sometimes in other areas, as well. These constitutionally-protected protests were peaceful, and included people from various walks of life, joining together to seek an end to racist and violent policing across the U.S. and in Cincinnati.

### The City Issues Its First Unlawful Emergency Order and CPD and CPD Officer Defendants Engage in Indiscriminate Use of Force on May 29 and 30, 2020

42.     On the night of May 29, 2022, protests began in Cincinnati around 6 p.m. That night, John Doe Officers, clad in riot gear, blocked streets and avenues to prevent protesters from marching in certain directions.

43.     That night, John Doe Officers fired tear gas, pepper bombs, pepper spray, and flash bang grenades to disperse protesters.

44.     These uses of force were undertaken pursuant to CPD's orders, policies, practices, and customs, were indiscriminate, were without individualized probable cause, and were intended to suppress and/or deter protesters' expressive activity.

45.     Chief Eliot Isaac reported to media that CPD planned to do the same again the next night "if needed."

10

46.     After protests had largely concluded for the day, there were reports of property damage in downtown Cincinnati, and the CPD made numerous arrests for alleged offenses related to claimed property damage.

47.     The next day, on May 30, 2020, Cincinnati's Mayor at the time, Defendant Cranley, released an "Emergency Order." ("First Emergency Order," attached as Exhibit 1). He issued this order "[u]pon consultation with and at the request of the City Manager [Duhaney] and Chief of Police [Isaac]."

48.     In the First Emergency Order, Cranley claimed that there was an "emergency declaration currently existing in the City of Cincinnati, which declaration pursuant to Article III of the City Charter was approved by the City Council…" However, the First Emergency Order did not annex a copy of the purported emergency declaration, nor did it contain a copy of an ordinance or other evidence of approval by Council.

49.     The First Emergency Order contained Cranley's order for "implementation of a curfew from 10 p.m. to 6 a.m. in designated neighborhoods of the City of Cincinnati" ("Curfew"). The First Emergency Order further provided that:

> Individuals are prohibited from appearing in the public spaces of the City of Cincinnati neighborhoods of Over-the-Rhine, the Central Business District/Downton, the Banks, and the West End during the period of the curfew. This Order is inapplicable to the City of Cincinnati officials, members of the public safety forces, emergency personnel, health care professionals, essential workers, people experiencing homelessness and local government officials engaged in their lawful duties.

50.     The First Emergency Order was unconstitutionally vague and left people in Cincinnati to guess whether the Curfew applied to them.

51.     The Emergency Order that established the Curfew explicitly named several classes of persons to whom the Curfew was not applicable, including "health care

11

professionals, essential workers, and people experiencing homelessness," among others. However, the Emergency Order did not define any of these terms.

52.    Relatedly, at the time of these events, during the early days of the COVID-19 pandemic, the Ohio Department of Health had issued orders which did define "Essential Activities," "Essential Travel," "Essential Infrastructure," and "Essential Businesses and Operations," which described a broad range of persons and activities including everything from grocery stores, religious gatherings, gas stations, and "First Amendment protected speech."

53.    The Emergency Order likewise did not define what it meant to "appear" or what areas constituted "public spaces."

54.    In a press conference on the morning of Saturday, May 30, 2020, Mayor Cranley and Chief Isaac announced this Order to the public.

55.    After the issuance of this First Emergency Order, more than 1,000 people in and around Cincinnati resumed protesting on Saturday, May 30, 2020 during daytime hours, prior to the 10 p.m. implementation of the Curfew.

56.    Despite the lawful and nonviolent nature of the overwhelming majority of those in attendance, John Doe Officers at various times indiscriminately deployed tear gas, pepper spray, pepper balls, flashbang grenades, and other projectiles into the crowd, without probable cause. At times, these police officers deployed these weapons against or in the vicinity of disabled persons, children, passersby, or others not involved in the demonstrations.[3]

---

[3] Amnesty International cited the enforcement of the Curfew in Cincinnati as one example of "egregious human rights violations" committed by law enforcement during the recent protests over the George Floyd killing. Amnesty International, "USA: End unlawful police violence against Black Lives Matter protests" and interactive map, (June 23, 2020) available at https://www.amnesty.org/en/latest/news/2020/06/usa-end-unlawful-police-violence-against-black-lives-matter-protests/ and

57.    At one point, around 5 p.m., John Doe Officers deployed flash bang grenades and pepper balls at 12th and Race Streets to disperse a crowd.

58.    Later, outside of the CPD District 1 headquarters, John Doe Officers pushed protesters away from the area, firing tear gas, flash bang grenades, 40 Millimeter Rounds, and Bean Bag Rounds as the crowd marched away.

59.    Approximately 30 minutes prior to the start of the Curfew period, John Doe Officers deployed twice on a crowd of unarmed protesters that included children and clergy, and one youth was struck by a rubber bullet.

60.    These uses of force were undertaken pursuant to CPD's orders, policies, practices, and customs, were indiscriminate, were without individualized probable cause, and were intended to suppress and/or deter protesters' expressive activity.

### City, CPD, and CPD Officer Defendants Unlawfully Arrest, Detain, and Prosecute People Pursuant to the First Emergency Order on May 30, 2020

61.    Compounding the City's unlawful attempts to silence the voices of protesters, the City engaged in deceitful and unlawful enforcement of the First Emergency Order.

62.    Although the First Emergency Order was publicized in the form and in the text as shown above and in Exhibit 1, the City internally circulated a different, Second Version of the First Emergency Order.

63.    The Second Version of the First Emergency Order, issued by Cranley "[u]pon consultation with and at the request of the City Manager [Duhaney] and Chief of Police [Isaac]," was broader in the geographical scope of the Curfew in that it included an additional neighborhood within its sweep:

---

https://www.amnesty.org/en/latest/news/2020/06/usa-unlawful-use-of-force-by-police-at-black-lives-matter-protests/.

a. In the publicly-circulated First Version of the First Emergency Order, the curfew was applicable only to "the neighborhoods of [1]*Over-the-Rhine, [2] the Central Business District/Downtown, [3] the Banks and [4] the West End…*". (*See* Exhibit 1) (emphasis and [bracketed numerals] added).

b. However, in the Second Version of the First Emergency Order, circulated only internally, the City purported to expand the Curfew. The Second Version of the First Emergency Order recited that the curfew was applicable in *five* neighborhoods, including "the neighborhoods of [1] Over-the-Rhine, [2] the Central Business District/Downtown, [3] the Banks, [4] *Pendleton*, and [5] the West End …" (emphasis and [bracketed numerals] added). (*See* Second Version of First Emergency Order, attached as Exhibit 2).

64. The City publicized the First Version of the First Emergency Order through social media, local television, and radio stations beginning early in the day on May 30, and no efforts were made to ensure that local media updated the reporting.

65. Nonetheless, the City instructed John Doe Officers with the Second Version, ordering police to arrest people in violation of the unconstitutional and unpublicized Second Version of the First Emergency Order.

66. Protesters, attempting to comply with the law, left the four restricted neighborhoods when the Curfew began that night. Other people who had not been present at protests earlier likewise were outside that night in neighborhoods outside of the Curfew area.

67. John Doe Officers chased and harassed these people. These officers also used kettling as a tactic against the protestors.

68. Kettling, which derives from a German military term referring to an army surrounded by a much larger force, is a police tactic whereby officers confine a group of

14

people to a designated space by surrounding them on all sides so that there is no escape. By doing so, the officers effectively control people's movements.

69.     Kettling leads to the unlawful seizure of people without a reasonable basis, creates panic, elevates tensions, and chills speech. These officers accomplished this by forming police lines around protestors and others.

70.     John Doe Officers clad in riot gear with shields kettled protesters and blocked streets and means of departure for protestors at least 22 minutes prior to the start of the Curfew period.

71.     John Doe Officers then conducted a mass arrest, rounding up 78 people for Curfew violations, and pulling them off the streets without probable cause, in an effort to silence the voices of protesters who stood up against racist policing and brutality.

72.     These officers used kettling to prevent innocent protesters and others from leaving the area of the demonstrations when the protesters were attempting to comply with the Curfew.  Many protesters and others were prevented from travelling to their homes, cars, public transportation, or simply from crossing police lines.  Police kettled protesters into confined areas, prevented them from leaving, detained them until after the Curfew hours had begun, then arrested them for violating the Curfew.

73.     These officers arrested and charged protesters and others, for violations of the Curfew in the Pendleton neighborhood—which had not been included in the First Version of the First Emergency Order—and in other neighborhoods that were not included in either version of the First Emergency Order.

74.     On this night, arrested persons were held for significant lengths of time sitting on or near City streets, then transported to the HCJC.

75.     During transport to the HCJC, Defendants held these people in close quarters after their facemasks had been removed.

76.     Upon admission to the HCJC, they were held overnight in the custody of the County.

77.     These people were arraigned in the morning, and eventually released on or about the early afternoon of June 1, 2020.

**City Issues Second Unlawful Emergency Order and
CPD and CPD Officer Defendants Continue to Engage in
Indiscriminate Use of Force on May 31, 2020**

78.     After dozens of arrests on May 30, Mayor Cranley, "[u]pon consultation with and at the request of the City Manager [Duhaney] and Chief of Police [Isaac]," issued a second unconstitutional "Emergency Order" on May 31, 2020.  ("Second Emergency Order," attached as Exhibit 3).

79.     The Second Emergency Order used identical unconstitutional language, but modified the First Emergency Order in important respects.

80.     First, the Second Emergency Order extended the hours of the Curfew by one hour, imposing the restriction from 9:00 p.m. through 6:00 a.m.  In addition, the Second Emergency Order extended the geographic area of the Curfew to the entire City of Cincinnati, far beyond the four neighborhoods named in the First Version of the First Emergency Order.

81.     Lawful demonstrations again convened on May 31, 2020 in various areas of the City despite the prior night's arrests.

82.     More than 15,000 people joined the protests on May 31.

83.     Yet again, John Doe Officers continued to indiscriminately deploy so-called "less lethal weapons" against demonstrators, frequently deploying these indiscriminately into the crowd, and without probable cause at various times and places throughout the day.

84.     Outside the Hamilton County Courthouse, at approximately 8:45 p.m., John Doe Officers deployed large volumes of tear gas into a crowd of demonstrators, and thereafter arrested over one hundred persons in a single location, many of whom were detained on and ultimately transported on Cincinnati Metro busses.

85.     These uses of force were undertaken pursuant to CPD's orders, policies, practices, and customs, were indiscriminate, were without individualized probable cause, and were intended to suppress and/or deter protesters' expressive activity.

**City, CPD, and CPD Officer Defendants Unlawfully Arrest, Detain, and Prosecute People Pursuant to the Second Emergency Order on May 31, 2020**

86.     Just before 9 p.m. on Sunday, John Doe Officers deployed tear gas, pepper balls and flash bangs to disperse protestors.

87.     Yet again, John Doe Officers conducted a mass arrest, this time rounding up approximately 307 people and pulling them off the streets without probable cause, in an effort to silence the voices of protesters who stood up against racist policing and brutality.

88.     John Doe Officers again used kettling as a tactic against the protestors.

89.     Yet again, John Doe Officers kettled protesters and prevented them from leaving the area prior to the start of the Curfew, and then arrested people for protesting in violation of the Curfew.

90.     On May 31, 2020, Defendants City and the CPD Officer Defendants arrested approximately 300 people who were participating in these demonstrations.

91.     But on this night, the City abusively held arrested people for hours on buses, without access to toilets, water, or food, necessary medications, and other basic human needs, and in extremely close quarters while in the height of the early COVID-19 pandemic, when the only protection against the virus was masking and keeping distance between people.

17

92.     After suffering through abusive holding conditions on buses, the City then transported the arrested people to jail at the Hamilton County Justice Center ("HCJC").

93.     Once they arrived at the HCJC, John Doe Officers unloaded the arrested people into an outdoor vehicular service area, known as the "Sallyport." John Doe and/or John Roe Officers remained with these people and maintained custody of them overnight. Although temperatures had been sunny and warm during the daylight hours, overnight the temperature fell to 48 degrees overnight.

94.     As the temperature dropped that night, Defendants left these people to sit outdoors on cold hard concrete, with hands bound in plastic restraints, without access to shelter, toilets, water, food, prescription medications, blankets, adequate clothing, or other basic human needs.

95.     These people had also by and large had their facemasks confiscated by Defendants, and they were left in close quarters without any protection in the height of the early COVID-19 pandemic. Yet, these constitutionally-protected and essential protests had occurred amid an unprecedented public health crisis. Novel coronavirus, COVID-19, has now killed 1,000,000 Americans and continues to spread. At the time of these constitutionally-protected protests, COVID-19 was commonly understood to be transmittable through exposure to respiratory droplets. Public health and government officials, including in Cincinnati, had advised people to wear masks and to keep six feet apart, and these Defendants forcibly and knowingly put these arrested people in dangerous circumstances while holding them in close quarters.

96.     Yet, these same people were permitted to keep their cell phones, and used the same to post news of their plight to social media. Local media were able to verify the story with the use of a camera-equipped drone that flew over the Sallyport and captured photos of the people in these horrifying conditions.

97.    Slowly, these people were either processed and admitted into custody of the HCJC or were held continuously in the Sallyport, and were released the next morning and early afternoon, on June 1, 2020.

**City, CPD, and CPD Officer Defendants Continue to Engage in Unlawful Arrests and Indiscriminate Use of Force on June 1, 2020**

98.    Demonstrations again resumed on June 1, 2020.

99.    On June 1, 2020, Mayor Cranley threatened protestors saying, "If you get arrested, it won't be pleasant."

100.    Despite the lawful and nonviolent nature of these protests, John Doe Officers yet again continued on June 1, 2020 to indiscriminately and without probable cause deploy tear gas, pepper spray, pepper balls, explosive grenades, and other projectiles against or in the vicinity of disabled persons, children, passersby, or others not involved in the demonstrations.

101.    These uses of force were undertaken pursuant to CPD's orders, policies, practices, and customs, were indiscriminate, were without individualized probable cause, and were intended to suppress and/or deter protesters' expressive activity.

102.    At some point during the day, Mayor Cranley reportedly changed the Curfew start time from 9 p.m. to 8 p.m.

103.    While announcing this last-minute change, Cranley threatened protesters, saying, "This is serious. If you want to avoid, at a minimum, a really uncomfortable night at the justice center … then please obey the curfew."

104.    Yet again, on June 1, 2020, John Doe Officers used kettling as a tactic against the protestors.

105. John Doe Officers kettled protesters and prevented them from leaving the area prior to the start of the Curfew, and then arrested people for protesting in violation of the Curfew.

106. Without warning, the CPD Officer Defendants, starting just before 8 p.m., chased down protesters and conducted a mass arrest, this time rounding up dozens of people and pulling them off the streets without probable cause, in an effort to silence the voices of protesters who stood up against racist policing and brutality.

107. Journalists were swept up in CPD's aggressive tactics and mass arrests. John Doe Officers detained at least one reporter who was documenting the protests and arrests. Only after the story of the arrest was publicized on local news, and after the CPD was contacted by the media outlet's legal counsel was the reporter released without charge.

108. Approximately 66 people were arrested for Curfew violations on June 1, 2020.

109. On that night, John Doe and/or John Roe Officers and the City and/or County engaged again in abusive detention practices, this time taking detainees to two separate locations for separate detention processes.

110. One group of arrested persons was held for significant lengths of time sitting on or near City streets, then transported to the HCJC.

    a. During transport to the HCJC, Defendants held these people in close quarters after their facemasks had been removed.

    b. Upon admission to the HCJC, they were held overnight in the custody of the County.

    c. These people were arraigned in the morning, and eventually released on or about the early afternoon of June 2, 2020.

111.    The other group of arrested persons was held by Defendants for significant lengths of time sitting on or near City streets, then were taken to an underground transit station that the City had re-purposed as a mass arrest processing center.

      a.    At this location, Defendants held these arrested people in custody in close quarters on buses, and vans, without water, food, toilets, or access to necessary medications for hours, and without their face masks.

      b.    Finally, the City and its employees/agents, including but not limited to the CPD Officer Defendants, slowly processed and released these people over a period of hours, taking off the buses for processing one-by-one.

      c.    Metro buses were not operating after 9 p.m. on this day.

      d.    These arrested people were released by Defendants in the night, far from their homes, cars, or access to other transportation.

112.    After June 1, there were more Curfew violation arrests, including approximately 10 arrests on Tuesday, June 2, 2020, among others.

**City's and CPD Officer Defendants' Indiscriminate Use of Force During Demonstrations was Excessive, Brutal, and in Violation of Protesters' Rights**

113.    The CPD and John Doe Officers used indiscriminate, violent crowd control tactics to corral, intimidate, and suppress the speech of lawful protestors. The force used by these officers was used to discourage and suppress peaceful protest in public places (including streets, sidewalks, and parks) in Cincinnati, particularly in the downtown area.

114.    Defendant City, through its officers and agents, knowingly placed these protestors in physical danger through indiscriminate use of excessive force.

115.    The City, through its officers and agents, used these so-called "less lethal weapons" indiscriminately and without warning, even at times when the crowd was merely chanting, kneeling, or standing.

116. These officers at times used these tactics in many instances on protestors who were demonstrating peacefully, without first issuing warnings, lawful orders (or any orders), or giving them adequate time or opportunity to disperse.

117. The City intentionally used force on peaceful protestors with no lawful justification.

118. Not only did this excessive use of force injure many protestors, journalists, and bystanders, but it chilled individuals from exercising their First Amendment rights and suppressed speech.

119. The City in some cases arrested medics who were seeking to give aid to those harmed.

120. Tear gas is a general term for aerosolized chemical agents. Tear gas generally includes CS (o-chlorobenzylidene malonitrile) and OC (oleoresin capsicum).

121. Tear gas activates pain receptors and leads to intense burning pain in the eyes, throat, lungs, skin and mucus membranes. It also causes disorientation, severe coughing, crying, and difficulty breathing.

122. The term 40 Millimeter Round refers to a large projectile which is filled inside with colored powder, which is designed to burst on impact, marking the target with the stain of the colored powder.

123. The 40 Millimeter launchers deployed by CPD shoot projectiles at very high speeds, and routinely leave severe contusions or welts on the body of a target even when striking the legs or arms. 40 Millimeter Rounds can inflict severe injury when they strike a victim in the head or other vulnerable parts of the body. When shot at close range, 40 Millimeter Rounds can cause serious bodily injury or death. When shot from farther range, 40 Millimeter Rounds have reduced accuracy.

22

124.    Defendants also used shotguns to fire Beanbag Rounds during the protests upon peaceful protestors.

125.    The term "Beanbag Round" is deceptive, since these are essentially "bags" made of fabric which fire as a single projectile.  However, the "bags" are filled with lead pellets, not beans.

126.    Beanbag Rounds deployed by police for crowd control regularly cause severe injuries in the victims.

127.    Pepper ball guns are air-powered launch devices that fire rounds containing plastic sphere projectiles filled with OC powder or other irritant substances. These spheres explode irritant powder onto the person who gets hit, causing the person to struggle to breathe.

128.    Pepper balls and pepper spray have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.

129.    Flashbang grenades are explosives that make a loud noise and flash of light, and are made to temporarily blind and/or deafen people and disorient them.

130.    Flashbang grenades can cause serious bodily injury, including damage to hearing, burns, or even death.

131.    In addition, the use of riot control face gear made the targeting of nearly all weapons used by these officers even more difficult.

132.    The City's CPD officers and other City officer agents consistently wore riot gear while present during the protests in Cincinnati beginning on May 29, 2020.

133.    Many people were hit with projectiles and many others inhaled tear gas or suffered pain and burning in their eyes, nose, mouth and throat from pepper balls and tear gas used by the City's officers and agents.

**City's Seizure of Property without Probable Cause was
in Violation of Protesters' Due Process Rights**

134.    During these arrests and detentions, Defendants City, CPD Officer Defendants, Defendant County, and/or Officers John Roes 1 through 450, seized—and never returned—the property of many arrested protesters without due process.

135.    During the course of arrests, Defendants routinely forced demonstrators and others who had been detained to surrender property, including backpacks, bullhorns, bicycles, and anything else that such persons happened to be carrying.

136.    Defendants seized personal property during arrests and failed or refused to provide any receipt or documentation to the arrested person which could permit them to obtain the return of their property.

137.    Defendants seized personal property during arrests and failed or refused to create internal documentation that would permit CPD or the County to track the location of the items after seizure, and to identify the owner of such seized property.

138.    Defendants failed to securely transport seized property to a safe location where it could be kept securely so that persons who had been arrested could recover their property.

139.    Defendants to maintain any kind of system for the tracking, transportation, storage, and return of seized property.

140.    The City and CPD Officer Defendants did not make any allegation in criminal complaints that any personal property was subject to seizure as evidence, or because the same was an instrumentality of a crime, nor did the City or CPD Officer Defendants offer any other legal rationale for the seizure of personal property.

141.    Upon their arrest, many protesters made prompt inquiries with the City and County about how they could recover their personal property.  Uniformly, the officers for

Defendants advised the arrested subjects that they would have to make an inquiry with the CPD or HCSO property departments to do so.

142.    Upon their release from custody, many of the persons who were arrested made inquiries by phone or in person to CPD and HCSO facilities and departments.  Yet, there was no organized system in place for the recovery of property seized during the mass arrests.

143.    To this day, it is unknown how CPD and HCSO disposed of personal property of the arrested people.

### City Issues Third Unlawful Emergency Order

144.    Despite rampant and unlawful police violence and hundreds of arrests, lawful demonstrations continued—but vast numbers of people were deterred from joining or rejoining protests due to fear of brutality, arrest, detention, and prosecution as a result of Defendants' misconduct during the prior days.

145.    As the days passed, with these smaller protests, the number of arrests also tapered.

146.    Nonetheless, on June 3, 2020, Mayor Cranley, again "[u]pon consultation with and at the request of the City Manager [Duhaney] and Chief of Police [Isaac]," issued yet another unlawful order—the Third Emergency Order— extending the Curfew. ("Third Emergency Order," attached as Exhibit 4).

147.    In the Third Emergency Order, Mayor Cranley continued to impose the Curfew over the entire City, extending the Curfew until June 8, 2020, but reduced the hours of the Curfew from 11 p.m. through 6 a.m.

**City Unlawfully Charges and Prosecutes Hundreds of People for Curfew Violations Pursuant to Ohio Rev. Code § 2917.13 for "Misconduct at Emergency"**

148.    During the ten days of the Curfew, the City arrested more than five hundred people who committed no illegal act, on the basis that they were physically present outdoors during the allegedly restricted hours.

149.    Except for the first day, the Curfew was in effect throughout the entire City. Yet nearly all of the arrests for violations of the Curfew took place in the neighborhoods were protests were taking place: Over the Rhine, Downtown Business District/Riverfront, and Clifton/University Heights/Fairview.  The Curfew went essentially unenforced in most of the City, while the areas that had seen protests experienced the equivalent of martial law.

150.    In nearly all of the arrest cases, despite lacking probable cause, the City charged each person with "Misconduct at an Emergency" under Ohio Rev. Code § 2917.13, which defines the offense as follows:

(A) No person shall knowingly do any of the following:

    (1) Hamper the lawful operations of any law enforcement officer, firefighter, rescuer, medical person, emergency medical services person, or other authorized person, engaged in the person's duties at the scene of a fire, accident, disaster, riot, or emergency of any kind;

    (2) Hamper the lawful activities of any emergency facility person who is engaged in the person's duties in an emergency facility;

    (3) Fail to obey the lawful order of any law enforcement officer engaged in the law enforcement officer's duties at the scene of or in connection with a fire, accident, disaster, riot, or emergency of any kind.

151.    The offense of Misconduct at an Emergency is a fourth-degree misdemeanor; however, Ohio Rev. Code § 2917.13 also provides for an enhanced version of the charge,

where, "[i]f a violation of this section creates a risk of physical harm to persons or property, misconduct at an emergency is a misdemeanor of the first degree." *Id.*

152.    The City charged these arrested people with Misconduct at an Emergency under the enhanced first degree misdemeanor, rather than a fourth degree offense, despite lacking probable cause to charge this offense in any form, and plainly without probable cause to charge this offense as a first degree misdemeanor.

153.    The criminal complaints charging these people with "Misconduct at an Emergency" were not sworn by the officers who had actually executed the arrests or witnessed the purported misconduct.  Rather, the complaints were signed by "processing officers" who were not present at the arrest.

154.    PSK Kelley, Officer Mike Harper, Officer K. Best, PO Condon (P329), PO O'Brien, PO Davis (P44), PO B. Rock, PO K. Horning (P917), Officer Daniels (P16), PS B. Smith (P517), PO P. Herrman (P109), Officer White (P583), PO Holyfield (P159), Officer J. Greene (P35), PO R. Utecht (419), PO Johnson (P219), PO J. Mendoza (P395), PO Kelsey (P425), among others, were processing and/or arrest officers who completed criminal complaints without probable cause during the protests.

155.    All of the hundreds of complaints for Misconduct at an Emergency were identical in language.  None of the complaints contained any description of the unique facts of each case, but rather contained only a conclusory allegation:

> The arrested individual identified above was found by Cincinnati Police to be violating the curfew order. The arrested was ordered by Cincinnati Police to leave the property. The arrested individual refused to comply with the lawful order to leave the area. The curfew order was in response to and declared under emergency conditions. Violating the curfew order further creates/prolongs the emergency situation created by ongoing risk of illegal violence and property damage.

*See* Example Complaint, attached as Exhibit 5.

156. Although the City had charged hundreds of individuals with the enhanced first-degree misdemeanor offense, not one of the complaints contained any allegation that any defendant had in fact engaged in any conduct that could endanger persons or property.

157. Further, in their enforcement of the Curfew, CPD officers and other officer agents of the City and CPD failed to acknowledge even the vague limitations in the applicability of the Curfew as defined by Mayor Cranley, and "[u]pon consultation with and at the request of the City Manager [Duhaney] and Chief of Police [Isaac]." These officers arrested hundreds of people without making any inquiry as to any person's status as an "essential worker" or whether that person was excluded from the Curfew under any of the other limitations provided by the text of the Emergency Orders.

158. As a result, persons being swept up and arrested by CPD officers were engaged in First Amendment protected speech, en route to essential jobs, or in the process of essential activities.

159. Not one of the hundreds of complaints filed against such people made any allegation to establish that the Curfew was in fact applicable to that person or that the arresting officer had actually ascertained such a fact.

**All Curfew Violation Prosecutions Are Dismissed**

160. The hundreds of unlawful arrests during the Curfew resulted in hundreds of prosecutions initiated and maintained by the City of Cincinnati, which were assigned to all of the fourteen judges in the Hamilton County Municipal Court.

161. These prosecutions forced the arrested and charged persons to be subjected to the ongoing stress, fear, and other emotional injuries and hardships that result from pending criminal prosecutions.

162.   As the hundreds of cases proceeded through the Hamilton County Municipal Court, the cases dragged on for months.

163.   The cases were not consolidated.  Each of the judges administered each of the cases according to their own courtroom procedures and schedules.

164.   Among the people arrested and charged with violating the Curfew, many participated in a common defense. A group of attorneys working together filed uniform motions in nearly all the cases, before all fourteen Municipal Court judges seeking the dismissal of the charges on several grounds.

165.   At least four of the fourteen judges granted the Motion on one or more grounds, resulting in dismissal of those prosecutions.  Those judges found, among other things, that the Curfew was unconstitutionally vague and had violated the First Amendment rights of those persons facing prosecution.  The City appealed these dismissals.

166.   Several of the other judges denied the Motions to Dismiss, without prejudice to the defendants' rights to raise Constitutional claims at trial.

167.   In pleadings filed by the City in the remaining cases, the City conceded that it lacked the ability to comply with Ohio Crim. R. 16 governing discovery, and to provide all the defendants a speedy trial in the Curfew cases.  *See* Example State's Response to Defendant's Motion to Compel, from *State v. Abrams*, No. 20/CRB10275, attached as Exhibit 6.

168.   By filing this response, the City therefore conceded that the cases would all be subject to dismissal.

169.   Ultimately, in April, May, and June 2021, the City filed pleadings or requested dismissal in all pending Curfew violation prosecutions, resulting in the dismissal of all the remaining charges in over 400 cases.

170. By that time, hundreds of people had spent ten to twelve months with first degree misdemeanor charges pending against them.

171. During that time, these people had suffered injury and faced professional and personal consequences as a result of the charges.

### City's Policies, Practices, and Customs

172. Defendant City, Mayor Cranley, City Manager Duhaney, Chief Isaac, and the CPD Officer Defendants engaged in repeated, widespread violations of law, as outlined in this Complaint, over the course of several nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing citywide Curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest; at times dispersing lawful and peaceful assemblies without warning and without providing directions, means, and/or opportunity to disperse before taking aggressive police action; hitting swaths of protestors and nearby people with so-called "less lethal weapons" and/or tear gassing or pepper spraying them; selectively enforcing the Curfew against protestors by arresting them for violation of an unlawful curfew and placing them at great risk of exposure to COVID-19; violating protesters' due process equal protection rights; unlawfully detaining, arresting, and prosecuting people for Curfew violations; confining arrested people in unconstitutional conditions; and harassing, intimidating, and/or using force on individuals attempting to record or document police activity in public.

173. In conjunction with a history of protest-related constitutional violations, City, Mayor Cranley, City Manager Duhaney, Chief Isaac, the CPD Officer Defendants, and City employees/agents engaged in repeated widespread and unlawful acts several nights and

involving many locations constituting an unlawful custom and policy of violating protest participants' constitutional rights.

174. The City's historical responses to past protests illustrates that, while these occurrences are not daily events, if no injunction is issued, the cycle will continue.

175. Defendant City is liable for constitutional violations described in this Complaint by virtue of its policies, practices, and customs.

176. The unlawful acts and omissions of the CPD Officer Defendants and City employees/agents were committed at the direction and/or orders of Defendants former Mayor John Cranley and/or City Manager Duhaney and/or former Chief of Police Eliot Isaac, and/or their delegees.

177. The actions of the CPD Officer Defendants and City employees/agents were undertaken pursuant to policies, practices, and customs of the Defendant City and CPD, which were approved, encouraged, and/or ratified by policymakers for the Defendant City with final policymaking authority.

178. These policies and practices included the failure to adequately train, supervise, monitor, and discipline employees who engaged in constitutional violations as described in this Complaint.

179. One or more of the policies, practices, and customs described in this Complaint was maintained and implemented by Defendant City with deliberate indifference to the constitutional rights of Plaintiffs, Class, and Subclass members, and were a moving force behind the violations of those rights.

180. At all material times herein, the City was responsible for supervising, enacting, and enforcing the CPD's and its employees'/agents' conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the CPD.

181.    The acts and omissions of the CPD Officer Defendants and City employees/agents were at all material times pursuant to the customs, policies, practices, and/or procedures of the Defendant City and CPD.

182.    The Defendant City failed to train its officers in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for such training. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

183.    Moreover, the Defendant City is responsible for the actions of any non-CPD officers whose services were used during the protests and who were acting as agents of the CPD. By using those services, Defendant City was required to ensure that all officer agents complied with protestors' constitutional rights.

184.    The Defendant City also failed to adopt adequate policies for constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for adequate policies. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

185.    The Defendant City's Curfew described above was an official policy of the City which was unconstitutional on its face and as applied.

186.    Further, the Defendant City, former Mayor Cranley, former City Manager Duhaney, former Chief Isaac, and the City's final policymakers have acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protestors who do not pose any safety threat; by failing to properly train, supervise, and discipline officers regarding the proper use of force against protestors; by failing to rectify the unconstitutional custom of officers using

"less-lethal" force to control and suppress demonstrations; and by failing to provide adequate policies. This constituted a conscious choice by the Defendant City not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues.

187.    These widespread practices constituted de facto policy and were allowed to exist because policymakers with authority over the conduct exhibited deliberate indifference to the problems, thereby effectively ratifying them.

188.    Furthermore, the practices described in this Complaint were allowed to flourish because the Defendant City declined to implement sufficient policies, supervision, or training, even though the need for such policies and training was obvious. Defendant City also declined to implement legitimate mechanisms for oversight or punishment of employees who committed such misconduct, thereby leading employees to believe that they could violate citizens' constitutional rights with impunity.

189.    The Defendant City's final policymakers received ample notice that officers were using "less-lethal" force against protestors to control and suppress demonstrations in the absence of any imminent threat to safety, including widely publicized videos and firsthand accounts circulated through the media.

190.    Historically, the CPD, its officers, and Defendant City have been called on numerous times dating many years concerning liability for and/or to investigate the use of "less-lethal" force, including bean bags, pepper balls, and other chemical agents against protestors. *See*, e.g., *Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006).

191.    The Defendant City's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was a moving force behind the violations of Plaintiffs', Class members', and Subclass members' constitutional rights.

192. These violations are also a direct result of the Defendant City's use of the services of police officers from other jurisdictions, who were also authorized by the City to use "less-lethal" weapons and kettling to control and suppress protests.

193. Further, former CPD Chief of Police Eliot Isaac was fully knowledgeable and apprised of the actions of the CPD Officer Defendants and City employees/agents described above and, upon information and belief, was on site on one or more days of the protest, observing this CPD operation, without repudiating or stopping the actions of the CPD Officer Defendants and City employees/agents, thereby ratifying them.

194. Further, upon information and belief, former Mayor John Cranley and/or City Manager Patrick Duhaney and/or former CPD Chief of Police Eliot Isaac and/or their delegees ordered the CPD Officer Defendants and City employees/agents without lawful justification to detain, arrest, and prosecute people engaged in protest activity before and during the Curfew hours as described in this Complaint.

195. The City has long been on notice of its own history of unconstitutionally arresting and prosecuting people who are engaged in protected First Amendment activity.

196. For example, during the 2011 Occupy Cincinnati protests, the City cited and/or arrested hundreds of protestors during Constitutionally protected demonstrations. The City ultimately dismissed all of those prosecutions.

197. Former Mayor John Cranley and/or City Manager Patrick Duhaney and/or former CPD Chief of Police Eliot Isaac and/or their delegees were aware that the City and its CPD Officer Defendants and City employees/agents were engaging in unlawful arrests and prosecutions, and they did not repudiate or stop the actions of CPD Officer Defendants and City employees/agents that caused those unconstitutional conditions, thereby ratifying them

198.   Likewise, upon information and belief, Mayor John Cranley and/or City Manager Patrick Duhaney and/or CPD Chief of Police Eliot Isaac and/or their delegees were aware of the unconstitutional conditions of confinement to which arrested protesters were subjected, and they did not repudiate or stop the actions of the CPD Officer Defendants and/or City employees/agents that caused those unconstitutional conditions, thereby ratifying them.

199.   Likewise, upon information and belief, Mayor John Cranley and/or City Manager Patrick Duhaney and/or CPD Chief of Police Eliot Isaac and/or their delegees were aware of the unlawful seizure of property of arrested protesters by CPD Officer Defendants and/or City employees/agents, and they did not repudiate or stop the actions of those officers/employees/agents, thereby ratifying them.

200.   Thus, the Defendant City, through its final policymakers, ratified the misconduct of the CPD Officer Defendants and its City employees/agents.

201.   Further, upon information and belief, as the City had done in the past, Mayor John Cranley and/or City Manager Patrick Duhaney and/or CPD Chief of Police Eliot Isaac and/or their delegees ordered the continued prosecution of people arrested for Curfew violations despite an obvious lack of probable cause, which caused the prosecutions to drag on for months.

202.   The violations of the constitutional rights of the Plaintiffs, Class members, and Subclass members, defined *infra*, and the damages they suffered, were a direct result of the Defendant City's official, unconstitutional policies, practices, and customs.

**County's Policies, Practices, and Customs**

203.   Defendant County, Officers John Roes 1 through 450, and the County's employees/agents engaged in repeated, widespread violations of law, as outlined in this

Complaint, over the course of at least two nights, holding arrested protesters in unconstitutional conditions of confinement in retaliation for their protected First Amendment activity.

204. In conjunction with a history of constitutional violations in the HCJC, Defendant County, John Roes 1 through 450, and/or the County's employees/agents held protesters without access to basic needs, including water, toilets, food, blankets, and necessary medications, constituting an unlawful custom and policy of violating protest participants' constitutional rights.

205. These conditions of confinement gave rise to a significant risk of serious illness and/or injury for Plaintiffs, Class members, and Subclass members.

206. Defendant County is liable for constitutional violations described in this Complaint by virtue of its policies, practices, and customs.

207. The unlawful acts and omissions of John Roes 1 through 450, and/or the County's employees/agents were committed at the direction and/or orders of Defendant former Sheriff Jim Neil and/or his delegees.

208. The actions of John Roes 1 through 450 and County employees/agents were undertaken pursuant to policies, practices, and customs of the Defendant County and HCSO/HCJC, which were approved, encouraged, and/or ratified by policymakers for the Defendant County with final policymaking authority.

209. These policies and practices included the failure to adequately train, supervise, monitor, and discipline employees who engaged in constitutional violations as described in this Complaint.

210. One or more of the policies, practices, and customs described in this Complaint was maintained and implemented by Defendant County with deliberate

indifference to the constitutional rights of Plaintiffs, Class, and Subclass members, and were a moving force behind the violations of those rights.

211.    At all material times herein, the County was responsible for supervising, enacting, and enforcing the HCSO's and HCJC's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the HCSO and HCJC.

212.    The acts and omissions of John Roes 1 through 450 and/or the County's employees/agents were at all material times pursuant to the customs, policies, practices, and/or procedures of the Defendant County and HCSO/HCJC.

213.    The Defendant County failed to train its officers in the constitutional responses to the custody of protesters, and failed to adopt adequate policies for constitutional responses to custody of protesters, despite the history of past constitutional violations in the HCJC and despite the obvious need for such training and policies.

214.    Further, the Defendant County, its final policymakers, and Defendant Neil have acted with deliberate indifference to the constitutional rights of protestors in custody by authorizing, both explicitly and implicitly, unconstitutional conditions of confinement; by failing to rectify the unconstitutional conditions of confinement over the course of each night they were imposed; and by failing to provide adequate policies. This constituted a conscious choice by the Defendant County not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues.

215.    These widespread practices constituted de facto policy and were allowed to exist because policymakers with authority over the conduct exhibited deliberate indifference to the problems, thereby effectively ratifying them.

216.    Furthermore, the practices described in this Complaint were allowed to flourish because the Defendant County declined to implement sufficient policies,

supervision, or training, even though the need for such policies and training was obvious. Defendant County also declined to implement legitimate mechanisms for oversight or punishment of employees who committed such misconduct, thereby leading employees to believe that they could violate citizens' constitutional rights with impunity.

217.   The Defendant County's final policymakers received ample notice that HCSO and HCJC officers were imposing unconstitutional conditions of confinement, including widely publicized videos and firsthand accounts circulated through the media.

218.   Despite historical notice of unconstitutional conditions of confinement in the HCJC, the Defendant County deliberately failed to implement any review, training, supervision, or policies in the HCJC to prevent such conditions from occurring prior to or during the events at issue in this Complaint.

219.   Further, Sheriff Jim Neil and/or his delegees was/were fully knowledgeable and apprised of the actions of officers John Roes 1 through 450 and the County's employees/agents described above and did not repudiate or stop the actions of those officers, thereby ratifying them.

220.   The violations of the constitutional rights of the Plaintiffs, Class members, and Subclass members, and the damages they suffered, were a direct result of the Defendant County's official, unconstitutional policies, practices, and customs.

CLASS REPRESENTATIVE PLAINTIFFS' ACCOUNTS

221.   As set forth below, Class Representative Plaintiffs suffered constitutional violations during the events described above.

**Mary Zeiser**

222.   Plaintiff Mary Zeiser participated in the protests every day beginning on May 29, 2020, through June 1, 2020.

223.    Zeiser attended for the purpose of protesting police brutality.

224.    On Saturday, May 30, 2020, Zeiser marched and gathered throughout the day along with groups of other protesters in various parts of downtown and Over the Rhine. As 10:00 p.m. approached (when the Curfew allegedly would begin), Zeiser was marching North on Reading Road, away from Over the Rhine and all the neighborhoods where the Curfew would be in effect. The march was peaceful.

225.    As the group marched north on Reading Road, Cincinnati police lined up and prevented the protesters from marching further north, directing them west, down Thirteenth Street.

226.    As Zeiser and others walked down Thirteenth Street, Zeiser was violently seized, assaulted, and arrested by John Doe Officers, and taken into custody.

227.    CPD officers used excessive force in seizing and arresting Zeiser. CPD officers throwing Zeiser to the ground, forcing Zeiser into handcuffs.

228.    Although CPD officers arrested Zeiser, they gave warnings to other persons who were also on that street at that time to go home in order to avoid arrest. Other complied with the orders, and were not arrested. CPD officers gave no such warning to Zeiser.

229.    At the time of the arrest, Zeiser was carrying a bullhorn, and wearing a backpack with various personal property inside it.

230.    Zeiser inquired of the CPD officers what would happen to Zeiser's personal property, but none of them provided Zeiser with any information. The last time Zeiser saw the personal property, it was being taken by police officers.

231.    Zeiser attempted to recover the personal property from the CPD and the HCSO.

39

232.    Zeiser was unable to recover the personal property.  Each time being told by CPD and HCSO that there was no record of Zeiser's personal property being taken into custody.

233.    These seizure of Zeiser's property and arrest were without probable cause.

234.    Cincinnati police transported Zeiser in a group transport vehicle along with several other prisoners and transferred Zeiser into the custody of the Hamilton County Sheriff, where Zeiser spent the night in jail.

235.    Defendant CPD officer PSK Kelley, "processing officer," completed the complaint against Zeiser for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

236.    The name of Defendant Mike Harper likewise appeared on the complaint, written by Defendant Kelley.

237.    Neither Defendant Kelley nor Defendant Harper had probable cause to charge Zeiser with any crime, but both CPD officers nonetheless instigated, influenced, and/or participated in the decision to charge Zeiser with Misconduct at Emergency.

238.    A friend posted bond for Zeiser, and Zeiser was released the next day, on May 31, 2020.

239.    Zeiser promptly rejoined the protests and demonstrations that continued that day.

240.    In the afternoon on May 31, 2020, Zeiser was in Washington Park attending a rally where many other protesters had gathered.

241.    John Doe Officers arrived and began to harass and intimidate the protesters, forming lines, wielding riot shields, and bearing various types of weaponry.

242.    However, since it was daylight hours a public park, there were many people at the park who were not involved in any protest or demonstration. Families had congregated with children, parents, and elderly people as they do most days in the park.

243.    With complete disregard for the presence of children and elderly people, without warning and without lawful justification, John Doe Officers indiscriminately and without probable cause began firing pepper balls, and deployed tear gas cannisters that released large clouds of noxious irritant gas over large swaths of the park. The billowing fumes quickly overtook the playground and grassy areas, sending children and their parents gasping as they fled the chaos.

244.    Zeiser was engulfed in the tear gas after John Doe Officers lodged the attack and suffered severe burning and disorientation, and struggled to breathe.

245.    Despite the persistent displays of gratuitous and excessive force against demonstrators by John Doe Officers, Zeiser continued to participate in the demonstration.

246.    John Doe Officers did not cease in their attempts to brutalize demonstrators.

247.    Later that day, Zeiser was hit by a pepper ball fired indiscriminately, without probable cause, by one of John Doe Officers as Zeiser engaged in peaceful, lawful exercise of First Amendment rights.

248.    The pepper ball did not burst when it hit Zeiser, but did cause extreme pain upon impact. Zeiser found the pepper ball after it dropped to the ground on impact. The pepper ball had failed to explode because it had been modified: the pepper ball was taped so as to cause it to behave like bullet, inflicting more pain upon impact.

249.    Zeiser was forced to suffer the burden of facing ongoing prosecution over the next several months, which had detrimental effects on Zeiser's personal and professional life.

250. Zeiser's counsel filed a Motion to Dismiss the pending criminal charges as part of the common defense.

251. On December 3, 2020, Judge Ted Berry granted the Motion to Dismiss, and the case against Zeiser was dismissed.

252. But attorneys for the City appealed the dismissal.

253. On May 21, 2021, the City ultimately dismissed the appeal.

**Chase Butler and Paulina Prokhorova**

254. Plaintiffs Chase Butler and Paulina Prokhorova reside in Over the Rhine, where the Curfew was in effect on May 30, 2020.

255. When protests began on May 29, 2020, their neighborhood came to life with protesters marching and demonstrating.

256. In addition, the restaurants and bars of Over the Rhine continued to draw traffic from ordinary customers not involved in any protest or demonstration.

257. Butler and Prokhorova could not help but to see and hear the demonstrations all around their apartment, and they participated at various times.

258. At various times on May 29 and May 30, they came in close contact with John Doe Officers who began enforcing police lines and blocking streets in an effort to block traffic.

259. At one point, as Butler and Prokhorova stood on the street in a crowd near their home, a John Doe Officer threw a flash bang grenade into a group of people that were standing on the street. The officer gave no warning prior to throwing the grenade, and it exploded loudly in close proximity to many people who stood nearby peacefully.

260. On May 30, 2020, Butler and Prokhorova had complied with the Curfew, returning to their apartment before 10:00 p.m. when the Curfew took effect.

261.    Butler and Prokhorova had changed into comfortable clothes to retire for the night when they heard a loud commotion and calls of distress from the street below.

262.    Drawn by the noise outside, Butler and Prokhorova ventured outside their apartment onto the sidewalk to investigate.  They walked down the block and shortly were met by a group of John Doe Officers, who ordered them to go home.

263.    Butler and Prokhorova engaged briefly with the John Doe Officers, then turned to return to their apartment.

264.    As they walked away from the John Doe Officers and toward their apartment, one of the officers gave the direction to seize them.  Four John Doe Officers, some in body armor rushed them and tackled them on the sidewalk just steps from their front door.

265.    The arrest report for Prokhorova recited her weight as 120 pounds.  Yet, the two John Doe Officers that tackled her deployed a Taser on her within seconds of their physical seizure of her, claiming that it was necessary in order to subdue her.  During the course of her arrest, one of the officers kicked her in the stomach.

266.    The arresting John Doe Officers used excessive force when they tackled and handcuffed Butler and Prokhorova, who at the time of their arrest were complying with the orders given by the police.

267.    After their arrest, Butler and Prokhorova were ordered to sit on the sidewalk on their block, along with numerous other prisoners.

268.    As John Doe Officers held Prokhorova and Butler, routine Saturday night patrons of local bars and restaurants and other passersby streamed past them on the sidewalk.  The arresting John Doe Officers permitted other people to walk by, in some cases advising them that they should go home, and in other cases saying nothing.

269.    When one of the other prisoners asked one of the arresting officers for his badge number, the John Doe Officer advised him that he would be charged with additional offenses if he continued to request information about the arresting officers.

270.    Prokhorova and Butler were transported in a CPD cruiser.  As the officer loaded them into the vehicle, he admonished them that they should not travel to Cincinnati and roam around during a riot.  The officer was under the clear misapprehension that they did not reside in the City.

271.    Defendant CPD officer K. Best, "processing officer," completed the complaint against Butler for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

272.    The name of Defendant PO Condon (P329) likewise appeared on the complaint, written by Defendant Best.

273.    Neither Defendant Best nor Defendant Condon had probable cause to charge Butler with any crime, but both CPD officers nonetheless instigated, influenced, and/or participated in the decision to charge him with Misconduct at Emergency.

274.    Defendant CPD officer P.O. O'Brien, "processing officer," completed the complaint against Prokhorov for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

275.    The name of Defendant PO Davis (P44) likewise appeared on the complaint, written by Defendant O'Brien.

276.    Neither Defendant O'Brien nor Defendant Davis had probable cause to charge Prokhorova with any crime, but both CPD officers nonetheless instigated, influenced, and/or participated in the decision to charge him with Misconduct at Emergency.

44

277. Prokhorova and Butler spent the night in the HCJC and a friend paid a bond in order to secure their release.

278. Butler and Prokhorova were forced to suffer the burden of facing ongoing prosecution over the next several months, which had a significant detrimental impact on their personal and professional lives, and imposed constant mental distress for the outcome.

279. On July 7, 2020, counsel for Butler and Prokhorova filed a Motion to Dismiss the pending criminal charges as part of the common defense.

280. On March 19, 2021, Hamilton County Municipal Judge Jackie Ginnochio denied the Motion.

281. On April 8, 2021, the State conceded that it could not satisfy its discovery obligations under Ohio Crim. R. 16.

282. On April 19, 2021, upon the State's request, the court dismissed charges against Butler and Prokhorova, concluding the prosecution.

### Paula Bennett

283. Paula Bennett participated in demonstrations throughout the weekend of May 29, 2020.

284. On the evening of Monday, June 1, 2020, she had spent the day attending protests and spending time with friends and others who were participating.

285. Bennett was mindful of the Curfew, which according to the Order issued by former Mayor Cranley, was to take effect at 9:00 p.m. on that night. As 8:00 p.m. approached, she rode her electric bicycle through the Over the Rhine neighborhood of Cincinnati toward a friend's house, where she intended to stay once the Curfew took effect.

286.    However, shortly after 8:00 p.m., she rode past a group of John Doe Officers who appeared to be patrolling for protesters.  At the next corner, she saw two John Doe Officers on foot, who moved to block her passage, and then tackled her, knocking her from her bicycle to the pavement.

287.    Bennett sustained injuries as a result of the excessive force used by the two male John Doe Officers who tackled her.  Once they had forced her to the ground, they handcuffed her arms behind her back and lifted her, dragging her feet and legs on the ground as they forced her to move.

288.    The John Doe Officers claimed that she was in violation of the Curfew, despite the fact that it was not yet 9:00 p.m.  The John Doe Officers offered no explanation as to the change in Curfew time.

289.    Bennett was handcuffed and walked to a place on the street nearby where John Doe Officers were holding a group of other people, and was made to sit on the concrete.

290.    Bennett inquired of the John Doe Officers what would happen to her electric bicycle, but none of them provided her with any information.  The last time she saw her bicycle, it was on the road near where she had been confined.

291.    Bennett was transported to the HCJC in a police van with several other arrested people.

292.    When Bennett arrived at the HCJC, it was apparent that she was injured. She was given crutches by the staff at the HCJC.

293.    Bennett spent the night at the HCJC, and was brought before a judge the following morning for arraignment.  She was released on her own recognizance.

294.    After she was released from the HCJC, Bennett had difficulty walking as she attempted to return to her home.

46

295.    Later that morning, Bennett sought treatment for her injuries at the emergency room.

296.    Bennett attempted to recover her electric bicycle from the CPD and the HCSO.  Bennett made numerous attempts to find anyone who might have information about where her bicycle had been taken, and how she could retrieve it.

297.    Defendant CPD officer K. Best, "processing officer," completed the complaint against Bennett for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

298.    The name of Defendant PO B. Rock likewise appeared on the complaint, written by Defendant O'Brien.

299.    Neither Defendant Best nor Defendant Rock had probable cause to charge Bennett with any crime, but both CPD officers nonetheless instigated, influenced, and/or participated in the decision to charge him with Misconduct at Emergency.

300.    Bennett was told by both CPD and HCSO that there was no record of her electric bicycle being taken into custody.

301.    Bennett was forced to suffer the burden of facing ongoing prosecution over the next several months, which had detrimental effects on Bennett's personal life.

302.    On July 7, 2020, Bennett's counsel filed a Motion to Dismiss the pending criminal charges as part of the common defense.

303.    On December 9, 2020, Judge Brad Greenberg granted the Motion to Dismiss, and the case against Bennett was dismissed.

304.    But attorneys for the City appealed the dismissal.

305.    The appeal remained pending for several months, but on May 21, 2021, the City ultimately dismissed the appeal.

47

**Zoe Keller**

306.    Zoe Keller is a 24-year-old project manager in the construction industry.

307.    She joined protests in support of the movement for Black lives on Friday, May 29, Saturday, May 30, and Sunday, May 31, 2020.

308.    On Friday, May 29, 2020, Keller joined the protest in the evening after she was done working for the day.

309.    There was no Curfew in place on this day.

310.    The protest ended up near a park in downtown Cincinnati. John Doe Officers began ordering the protesters to "move back," but it was unclear as to why or where they wanted the protesters to move.

311.    All of a sudden, without warning, Keller heard loud explosion noises. John Doe Officers had indiscriminately deployed tear gas into the crowd, without warning, lawful justification, or probable cause.

312.    A couple seconds later, the air around her became cloudy and she and the protesters around her began crying and coughing. Keller's head hurt badly and she felt nauseated.

313.    Defendants indiscriminately deployed tear gas more than one into the protest crowd that night, without warning, lawful justification, or probable cause, and Keller suffered its effects.

314.    On Saturday, May 30, 2020, Keller again joined the protests after her work ended for the day.

315.    On this day, she joined a protest event focused on art and music and then later joined a protest march. The art event and march were peaceful.

316.    Nonetheless, after the protest group converged outside a police station on Central Parkway, John Doe Officers, who stood in a line outside the station with bicycles in front of them, began ordering protesters to "move back."

317.    The group of protesters attempted to move back, but the officers advanced faster than the protesters could move.

318.    At one point, two to three John Doe Officers pinned and shoved Keller's friend, a Black man, to a fence with their bicycles, while continuing to yell at him to "move back" even though there was nowhere for him to move.

319.    Only after Keller intervened, pleading to let him go because he could not get out from the fenced area, did these officers allow Keller's friend to go.

320.    After this, the protest continued in a march that moved toward the downtown area.

321.    As Keller and her friends approached an area on 7th Street near a large flower mural, despite not hearing any orders or having any indication they were not permitted in the area, they were suddenly hit with something painful on their legs and they ran to safety. Once they reached a safe area around the corner, Keller and her friend realized they had been hit in the legs with projectiles fired by John Doe Officers, which left marks on their legs and burned and hurt. Defendants had fired the projectiles indiscriminately, without warning, lawful justification, or probable cause.

322.    Keller later left the protest and returned home.

323.    On Sunday, May 31, 2020, Keller again joined protests. She began her day at a protest at a park.

324.    Later on, the group moved downtown to join others at the Hamilton County Court of Common Pleas.

325.    Keller knew there was a 9 p.m. Curfew set for that day and she intended to leave downtown prior to the start of the Curfew.

326.    The group rallied at the courthouse, but, without warning and prior to the 9 p.m. Curfew, suddenly John Doe Officers indiscriminately deployed teargas into the crowd of protesters, which included children and elders, without warning, lawful justification, or probable cause.

327.    Keller and the other people around her suffered the painful effects of that teargas.

328.    John Doe Officers were lined up to the right of the courthouse, preventing Keller and the others from departing the area in that direction.  Then she saw John Doe Officers coming around the corner to the left of the courthouse, also blocking any departure avenues in that direction.

329.    The group began moving backward, away from the courthouse.

330.    Keller wanted to head toward her car to leave, and tried to head in that direction, but continued moving with a larger group because she was afraid that her safety would be jeopardized if she separated from the crowd.

331.    John Doe Officers blocked access to side streets and avenues of departure as the crowd moved in the direction that the officers forced them to walk.

332.    Keller saw other people attempt to leave for safety on side streets or near these lines of officers, and saw them arrested as they tried to leave.

333.    Eventually, John Doe Officers forced Keller and the group with which she was walking to turn a corner onto a street where, at the other end of the block, a line of John Doe Officers prevented them from moving forward. Then other John Doe Officers formed a line behind them, trapping the protesters.

334.    These John Doe Officers kettled the protesters, who were scared for their safety as the officers closed in on them.

335.    John Doe Officers ordered the group to sit down, and they complied.

336.    One officer told the group that the police would just be checking IDs and then they would let the group go. This was false.

337.    After checking IDs, John Doe Officers then handcuffed Keller and the other protesters with zip ties, pulled down their face masks, and then sent them around the corner, where they waited for a while and then were loaded onto buses.

338.    While they waited to be loaded onto buses, Keller heard John Doe Officers complaining about working and joking about which officer might make the most protester arrests that night.

339.    Finally, after being loaded onto buses, Keller and others were transported to the HCJC.

340.    Keller was in one of the first groups unloaded into the HCJC Sallyport that night.

341.    Throughout the night while being held in the buses and then in the Sallyport, Keller and the other protesters were deprived by Defendants of access to toilets, water, and food. It was cold overnight, and Keller and the others were not provided with blankets or other clothing appropriate for the weather.

342.    Protesters begged for hours for access to bathrooms while in the Sallyport, and only after one woman urinated on herself did Keller see John Doe and/or John Roe Officers begin to permit detained protesters to use the bathrooms.

343.    While in the Sallyport, Keller experienced significant shoulder pain and discomfort due to the way she had been handcuffed.

344.    Keller was outdoors in the Sallyport for several hours, and then was eventually brought into the HCJC for booking and processing. This process took a significant amount of time, and when Keller was finally placed into a cell, the sun had risen and it was morning.

345.    Keller was finally released on June 1, 2020 at around 2 p.m.

346.    A criminal complaint was filed against Keller on June 1, 2020.

347.    Defendant CPD PO K. Horning (P917), "processing officer," completed the complaint against Keller for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

348.    The name of Defendant Officer Daniels (P16) likewise appeared on the complaint, written by Defendant Horning.

349.    Neither Defendant Horning nor Defendant Daniels had probable cause to charge Keller with any crime, but both CPD officers nonetheless instigated, influenced, and/or participated in the decision to charge her with Misconduct at Emergency.

350.    Keller was forced to suffer the burden of facing ongoing prosecution over the next several months, which caused her stress and concern.

351.    On July 7, 2020, counsel for Keller filed a Motion to Dismiss the pending criminal charges as part of the common defense.

352.    Hamilton County Municipal Judge Heather Russell never ruled on the Motion.

353.    On April 8, 2021, the State conceded that it could not satisfy its discovery obligations under Ohio Crim. R. 16.

354.    On June 7, 2021, upon the State's request, the court dismissed charges against Keller, concluding the prosecution of Keller in this matter.

355. Keller's experiences during this period traumatized her. She sought out and continues to receive counseling for the emotional injuries she suffered during these events. In addition, she continues to suffer shoulder problems. Keller continues to experience concern about her safety and wellbeing in relation to protest activity.

### Suann Lockard

356. Plaintiff Suann Lockard participated in demonstrations throughout the weekend of May 29, 2020.

357. On Sunday, May 31, 2020, Lockard was present at the Hamilton County Courthouse as people gathered to demonstrate.

358. A crowd was gathered there that evening, as demonstrators had been engaged in protests around the City throughout the day.

359. Lockard was aware that the Curfew would take effect at 9:00 p.m. that night, and intended to leave the area at that time.

360. There was a large police presence at and around the Courthouse. John Doe Officers in riot armor and various types of weapons stood guard, and others patrolled.

361. As the Curfew approached, many in the crowd began to leave toward their cars, homes, or toward public transportation.

362. However, at approximately 8:50 p.m., police began indiscriminately firing tear gas cannisters into the street and the areas where the crowd had gathered, without warning, lawful justification, or probable cause. Large clouds of the noxious gas wafted over the crowds of innocent people. The people in the crowd became visibly affected. People began to flee, and others became exposed to the gas and suffered immediate irritation, difficulty breathing, tearing of the eyes, and blurred vision.

363.    As a result, many people were immobilized, unable to leave the area, and in need of medical care.  Other members of the crowd responded, providing assistance to those who had been exposed to tear gas.

364.    Lockard was exposed to tear gas and suffered severe irritation of her eyes, nose, and skin.

365.    As chaos ensued, John Doe Officers began indiscriminately and without probable cause firing so called "less-lethal" weapons into the crowd.

366.    Some people in the crowd attempted to remove the tear gas cannisters that were spewing noxious gas into the crowd, but John Doe Officers would quickly target any such person with pepper balls whenever they attempted to do so.

367.    Lockard attempted to flee the scene to return home.

368.    However, as she and her friends walked away from the Courthouse, they were stopped by a line of John Doe Officers.  The officers were directing pedestrians to walk north, even as people attempted to reach their cars, homes, or public transport to the south and west.

369.    Lockard and others followed the direction and orders of the John Doe Officers and walked north.  Along the way, Lockard and others repeatedly attempted to turn in order to change direction to go toward their cars or homes.  Yet, each time, John Doe Officers blocked their route, and directed them in a different direction.  John Doe Officers explicitly advised that the pedestrians would be permitted to leave, but could only walk along the designated route.

370.    As she walked along with a large group of people, they were directed John Doe Officers onto smaller streets until they eventually reached a line of police officers who ordered them to halt.

371.    Now kettled by police on all sides, Lockard and her friends were ordered by John Doe Officers to sit in the street.  The officers assured Lockard and the others that they would be permitted to leave if they complied.

372.    Lockard and a large group of protesters were confined in the street for over an hour.  Soon thereafter, John Doe Officers began handcuffing the people who had been explicitly directed by police to walk there, under the assurance that they would be permitted to go home.

373.    Lockard was handcuffed and ordered to sit on the concrete.

374.    Eventually, police vehicles and Cincinnati Metro busses were brought in to transport the large group of people.

375.    Lockard was placed on a HCSO vehicle and transported to the HCJC.

376.    After having sat on the concrete for a lengthy period of time, the arrested people were then left in the transport vehicle, which sat motionless at the site of the mass arrest for more than an hour.

377.    As the hours passed, the arrested people began to suffer in the deprived conditions.  While sitting on the HCSO bus waiting to be transported, Lockard and others requested to use the bathroom.  But when they did so, the officers overseeing their custody denied their requests angrily.

378.    The HCSO vehicle eventually left the site of the mass arrest and transported the prisoners to the HCJC.

379.    The HCSO vehicle arrived at the HCJC and entered the Sallyport area.  The Sallyport had large vehicle entrances to the property, and was enclosed on all sides, but was exposed to the elements in all respects.

380.    Lockard and the other prisoners were not taken into the HCJC.  It was apparent that the HCSO lacked the resources to process and house the large number of

prisoners who had been arrested, so Lockard and the others were escorted off the vehicle and ordered to sit, handcuffed, on the concrete outdoors.

381.    By the time that Lockard and the others arrived at the HCSO and were confined in the Sallyport, hours had already passed.  Lockard and the others had been first confined in the street, then on the vehicle without food, water, toilets, medication, or other basic human needs.

382.    At the Sallyport, John Doe and/or John Roe Officers also did not provide food or water, nor did they assist any of the prisoners with obtaining any necessary medications or any other basic needs.  At this point Lockard and essentially all of the other prisoners needed access to a bathroom because they had been under arrest and handcuffed for hours. John Doe and/or John Roe Officers refused Lockard's request to be permitted to use the bathroom.

383.    As time passed, the physical need to use the bathroom overcame individual prisoners.  Lockard observed a woman, denied access to a toilet, who could no longer bear the pain, and urinated in her clothes.  The woman was not provided with clean clothes nor any water or materials to clean herself.  Yet, the woman was forced to sit in close quarters with other prisoners, who were exposed to the moisture and smell.

384.    As the night wore on, the temperature dropped.  Most of the prisoners were dressed for the warm spring temperatures earlier that day.  With the darkness, the temperature dropped and Lockard and the others shivered in the cold.

385.    At the Sallyport, John Doe and/or John Roe Officers themselves had water and snacks, which they ate in front of the prisoners.  John Doe and/or John Roe Officers in the Sallyport had a heater that they stood around to keep warm.  John Doe and/or John Roe Officers talked openly about how pleased they were to be being paid double or triple overtime at taxpayer expense to be working during that shift.

56

386.     John Doe and/or John Roe Officers provided no information to the protesters about how they would be processed.  Although some prisoners were occasionally taken in to the HCJC, there was no apparent logic to their treatment.

387.     As the night wore on, Lockard witnessed other arrested people suffer medical incidents and psychological distress.  Lockard witnessed at least one other person suffer an apparent seizure, while others broke down emotionally under the stress, cold, and deprivation.

388.     Lockard repeatedly asked John Doe and/or John Roe Officers to use the bathroom, but was repeatedly denied.  As the pressure built, Lockard was in pain as she attempted to hold out.  She began to cry.  Other prisoners spoke up for her, pleading with a HCSO John Roe Officer to allow her to use the bathroom.  As she wept, a HCSO John Roe Officer finally responded, and stated that he would take her inside.  However, just as abruptly, the officer changed his mind and sent her back.

389.     Eventually, Lockard broke down.  Having been handcuffed and left for hours, Lockard was explicitly denied access to the toilet repeatedly by John Doe and/or John Roe Officers who were specifically aware of her distress.  She could no longer control herself, and urinated as she stood outside.

390.     Lockard was forced remain in her dirty, wet clothes for hours thereafter.

391.     At approximately 11:00 a.m., food and water were finally provided to Lockard and the other prisoners who had been confined outdoors all night.

392.     Lockard and many other people who were arrested and kept outdoors in intolerable conditions that night were apparently released without bond or arraignment.

393.     Lockard was released at approximately 2:00 p.m. on the afternoon of June 1, 2020.  A criminal complaint was filed against her four days later on June 5, 2020.

394. Defendant CPD officer P.S. B. Smith (P517), "processing officer," completed the complaint against Lockard for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

395. The name of Defendant P.O. P. Herrman (P109) likewise appeared on the complaint, written by Defendant Smith.

396. Neither Defendant Smith nor Defendant Herrman had probable cause to charge Lockard with any crime, but both CPD officers nonetheless instigated, influenced, and/or participated in the decision to charge him with Misconduct at Emergency.

397. Lockard was forced to suffer the burden of facing ongoing prosecution over the next several months, which had detrimental effects on Lockard's personal life.

398. On July 7, 2020, Lockard's counsel filed a Motion to Dismiss the pending criminal charges as part of the common defense.

399. The Motion remained pending for several months before Municipal Court Judge Mike Peck. But Judge Peck never ruled on the Motion.

400. On April 8, 2021, the State conceded that it could not satisfy its discovery obligations under Ohio Crim. R. 16.

401. On April 18, 2021, upon the State's request, the court dismissed charges against Lockard.

### Arianna Hicks and Andrew Amrein

402. Arianna Hicks is a 24-year-old Black woman, who was completing her social work degree during the events giving rise to this Complaint, and now works as a case worker.

403. Andrew Amrein is a 32-year-old project manager who works in advertising.

404.    On May 31, 2020, Hicks and Amrein were in a relationship. They decided to attend what was for both of them their first protest.

405.    Hicks and Amrein arrived downtown in the late afternoon.

406.    After parking their car, they began walking, and saw people protesting and marching through the downtown area. Hicks and Amrein joined this large group, who were shouting, carrying signs, and chanting.

407.    The protest march that afternoon was peaceful and both Hicks and Amrein felt a sense of community and collective care among the protesters.

408.    In the evening, the protest reached the Hamilton County Common Pleas courthouse. The group chanted, but remained peaceful.

409.    Amrein and Hicks planned to leave the protest in time to abide with the Curfew.

410.    But at around 8:40 PM, Amrein noticed a line of police, including John Doe Officers, to the right of the courthouse, along with police vehicles, and other lines of police officers at other locations.

411.    Amrein realized that the protesters were being boxed in, and there was no obvious avenue to exit the area.

412.    Suddenly, without warning, these officers indiscriminately deployed tear gas into the crowd, without warning, lawful justification, or probable cause.

413.    Hicks and Amrein saw the smoky clouds and then felt burning.

414.    The officers then barked over a sound amplifier, saying that the Curfew was now in effect, and ordering protesters to disperse and leave the area – even though the 9 P.M. Curfew time had not yet arrived.

415.     John Doe Officers then descended upon the crowd of protesters, where Hicks and Amrein saw these officers attack people, shooting protesters at close range with bean bag rounds, tackling people to the ground, and punching people.

416.     By this time, Hicks, who had asthma, was suffering from the effects of the tear gas. She eventually could not see or breathe, and was coughing and spitting up. Amrein led her through the crowd as they ran away from the courthouse in the single direction that was not blocked by police officers.

417.     As John Doe Officers continued to push Hicks, Amrein, and the other protesters down the street, Amrein tried to go toward a police line, and said that he and Hicks were trying to get to their car. The officer he spoke to directed them to head down Court Street, where the other protesters were being funneled by John Doe Officers, and he told Amrein they would be able to get home that way.

418.     Hicks and Amrein followed the instructions to continue down Court Street, and joined the group of protesters who were forced to travel in the same direction.

419.     John Doe Officers blocked side streets and other avenues and prevented Hicks and Amrein, and the other protesters, from leaving the area or doing anything other than continuing down the path dictated by the police.

420.     Eventually John Doe officers kettled the group in which Amrein and Hicks were traveling by forcing them to turn onto a street. A line of police officers blocked the exit at the other end of the street, and then another line of officers closed them in from the back.

421.     While kettled in this area, Amrein told a John Doe Officer in the back line that he and Hicks had been trying to get to their car. The officer told them they had to go talk to an officer in the front line. Amrein followed his instruction and walked toward the front line, but a John Doe Officer there told him to "get the fuck back," and raised and pointed his gun at Amrein.

422.    John Doe Officers ordered Amrein, Hicks, and the other kettled protesters to sit down. They complied.

423.    One by one, over a period of time, John Doe Officers handcuffed the protesters, including Hicks and Amrein, with zip tie handcuffs, and eventually loaded them onto a metro bus, where they were forced to sit shoulder to shoulder with the windows closed and air conditioning off.

424.    The bus transported them to the HCJC, where Hicks and Amrein and the other protesters were held, on the bus, for multiple hours.

425.    During this period, Hicks, Amrein, and the other protesters were deprived by Defendants of access to toilets, water, and food. Multiple people who were not permitted to use the toilet eventually lost control and urinated on themselves.  The protesters begged for access to toilets. It was very hot on the bus, and the conditions were extremely uncomfortable and/or painful.

426.    At around midnight, Hicks, Amrein, and the other protesters were removed from the bus and taken into the HCJC Sallyport.

427.    Once in the Sallyport, there was still no water, food, or toilet access provided to the protesters.

428.    Amrein and Hicks were still not permitted to use the bathroom for hours after being taken into the Sallyport.

429.    While in the Sallyport overnight, with temperatures dropping into the 40s, Hicks and Amrein and others, who were dressed in summer clothes for the prior day's warm weather, were not provided by Defendants with blankets or adequate clothing.

430.    Finally, sometime in the late morning of June 1, 2020, John Doe and/or John Roe officers began processing the protesters detained in the Sallyport.

431.    Hicks and Amrein were finally released just after 11 a.m.

432.    Criminal complaints were filed against Amrein and Hicks four days later on June 5, 2020.

433.    Defendant CPD officer White (P583), "processing officer," completed the complaint against Amrein for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

434.    The name of Defendant PO Holyfield (P159) likewise appeared on the complaint, written by Defendant White.

435.    Defendant CPD officer J. Greene (P35), "processing officer," completed the complaint against Hicks for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

436.    The name of Defendant PO Holyfield (P159) likewise appeared on the complaint, written by Defendant White.

437.    Defendants White, J. Greene, and Holyfield did not have probable cause to charge Hicks or Amrein with any crime, but these CPD officers nonetheless instigated, influenced, and/or participated in the decision to charge them with Misconduct at Emergency.

438.    Hicks and Amrein were forced to suffer the burden of facing ongoing prosecution over the next several months, which caused them significant stress and other emotional damage.

439.    On July 7, 2020, Hicks' and Amrein's counsel filed Motions to Dismiss the pending criminal charges in their cases as part of the common defense.

440.    Hicks' case was assigned to Municipal Court Judge Curt Kissinger.

441.    Amrein's case was assigned to Municipal Court Judge Gwen Bender.

442.    The Motions remained pending for several months, and were denied in Hicks' and Amrein's cases on March 17, 2021 and March 18, 2021, respectively.

443. In early April 2021, the State conceded that it could not satisfy its discovery obligations under Ohio Crim. R. 16 in both Hicks' and Amrein's cases.

444. Upon the State's request, on April 19, 2021 in Amrein's case, and on April 20, 2021, Hicks' case, the court dismissed charges against Amrein and Hicks.

445. Hicks' terrifying first protest experience continues to affect her today. She has not protested since May 31, 2020. Likewise, Amrein felt shaken to the core by this experience.

446. Both Hicks and Amrein remain concerned about their safety and wellbeing should they protest again.

### Kimberly Calloway

447. Kimberly Calloway is a 40-year-old former healthcare worker.

448. On May 31, 2020, Calloway, along with her brother and sister, headed downtown to join the protests in the early evening.

449. This was Calloway's first protest. She felt that she had to join the protests to address the injustice of the death of George Floyd and so many other Black people at the hands of police.

450. Calloway parked her car and they walked together to the Hamilton County Common Pleas courthouse.

451. At the courthouse, Calloway and her siblings joined a large group of people engaged in protest in support of the Black Lives Matter movement.

452. The protest group later began marching thought the streets of Cincinnati. The march was spirited but peaceful, with chanting, holding signs, and other collective refrains.

453.    As the evening wore on, before the sun went down, Calloway noticed that more and more police were visible on the streets in all directions, lining the entrances to side streets, and including police officers in a line who were advancing on the rear of the marching group of protesters.

454.    John Doe Officers stood shoulder to shoulder blocking side streets, and in the line advancing on the protesters, carried firearms, which they pointed at the protesters, including Calloway.

455.    Calloway and her siblings wanted to go home, John Doe Officers prevented them from leaving by blocking all potentially available avenues to exit the march, and the officers in the rear of the march kept their firearms trained on the protesters.  Calloway and the protesters had no option but to keep moving forward.

456.    During this period, Calloway tried to approach these officers to tell them she was trying to go home, asking to be able to leave the area. In response, one of these John Doe Officers pointed his firearm at her and told her to "get back." Calloway had no choice but to remain with the protest group.

457.    Suddenly and without warning, when the protesters, including Calloway, reached one intersection, and John Doe Officers deployed a flash bang grenade and began shooting rubber bullets and/or other projectiles into the crowd, hitting Calloway and others. These uses of force were indiscriminate, and without warning, lawful justification, or probable cause.

458.    The protesters panicked, and part of the group, including Calloway, ran to the left, down an alley. When the group reached the other end of the alley, John Doe Officers were lined up shoulder-to-shoulder to the right of the alley.

459. There was nowhere to go. Calloway and others in the group were seized by John Doe Officers, who made them sit in the street, told them they were to be charged with Curfew violations, and then began handcuffing everyone with ziptie handcuffs.

460. Protesters implored these officers to just write them a ticket and let them go home, to no avail.

461. Eventually, after sitting and waiting for a lengthy period of time, Calloway and the others arrested at this location were loaded onto buses.

462. Once loaded, the buses traveled to the Hamilton County Justice Center, where they sat with the arrested protesters on board for approximately two hours.

463. During this time, protesters pleaded with John Doe Officers and/or John Roe Officers to use the bathroom, but these officers denied access to the bathroom.

464. Calloway has a kidney condition and requires regular hydration and access to bathrooms to maintain her already-limited kidney function.

465. While on the bus, Calloway asked to use the bathroom but was told by Defendants to sit down.

466. Eventually, after many protesters begged for bathroom access, the situation was unmanageable and people began urinating on themselves.

467. Subsequently, Calloway and the other protesters on the bus were unloaded and were taken into the sallyport area of the HCJC, where they were held with many other protesters.

468. Calloway still desperately needed to use the bathroom, and also required hydration, due to her kidney condition.

469. After arriving in the Sallyport, Calloway again asked John Doe Officers and/or John Roe Officers multiple times to use the bathroom. She then asked to use the

bathroom and for water, and told the officers she had kidney problems. Upon making this request, one of these officers told her to get back and threatened to shoot.

470.     Calloway, along with dozens of others, remained in the HCJC Sallyport all night long.

471.     While held in the Sallyport, Calloway and the other detained protesters were not provided with toilets, food, water, blankets or other clothing in the cold temperatures. The officers forced the group to lie down on the cold concrete.

472.     In the morning, when the sun began to rise, detained protesters tried to inch into the sunlight to warm up after the cold night they had been forced to endure. John Doe Officers and/or John Roe Officers threatened to shoot them if they did not get back.

473.     During the night, Calloway was terrified she would go into kidney failure due to her lack of access to toilets and water. When toilet access was eventually provided, Calloway needed to have consumed water to be able to go to the bathroom – but, due to her medical condition, because she had not been given water, she was unable to relieve herself.

474.     Finally, some food and small cups of water were provided in the morning to Calloway and the others. It was not enough to resolve Calloway's medical issues.

475.     Hours later, John Doe Officers and/or John Roe Officers finally began processing the detained protesters so that they could be released.

476.     Calloway was finally released from custody in the Sallyport at around noon.

477.     After she was released, Calloway contacted her medical providers to seek evaluation for her condition. She ultimately learned that her already-limited kidney function had decreased.

478.     A criminal complaint was filed against her four days later on June 5, 2020.

479.     Defendant CPD officer PO R. Utecht (419), "processing officer," completed the complaint against Calloway for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

480.     The name of Defendant P.O. Johnson (P219) likewise appeared on the complaint, written by Defendant Utecht.

481.     Neither Defendant Utecht nor Defendant Johnson had probable cause to charge Calloway with any crime, but both CPD officers nonetheless instigated, influenced, and/or participated in the decision to charge her with Misconduct at Emergency.

482.     On August 7, 2020, Calloway's counsel filed a Motion to Dismiss the pending criminal charges as part of the common defense.

483.     On December 3, 2020, Hamilton County Municipal Judge Ted Berry granted Calloway's Motion to Dismiss, and dismissed all charges against Calloway.

484.     The City appealed the dismissal, but then dismissed their pending appeal.

485.     The case returned to the trial court on May 21, 2021, and on the same day, the City filed an Entry of Voluntary Dismissal, concluding the prosecution of Calloway in this matter.

486.     Calloway's horrific first protest experience continues to affect her today. She has not protested since May 31, 2020, and remains concerned about her safety and wellbeing should she choose to protest again.

**Quinn Moore**

487.     Quinn Moore is a firefighter EMT who joined protests in Cincinnati on June 1, 2020, as a medic. She was joined by two friends.

488.    When Moore arrived at the protests on June 1, she was clearly marked as a medic, with white crosses in tape on both of her sleeves and backpack. She carried water and other supplies to provide to protesters to ensure that they were safe and healthy.

489.    On that day, Moore intended to leave the protests prior to the start of the Curfew period.

490.    Just before 7:30 p.m., the protest group that Moore was with began making away from Fountain Square area in downtown Cincinnati.

491.    Moore noticed at this time that John Doe Officers had suddenly appeared in all directions.

492.    As the march continued down the street, Moore saw that John Doe Officers in riot and/or SWAT gear were positioned in lines at all side streets and alleyways, blocking access to those streets and alleys.

493.    Moore and her friend then decided they would try to leave, having heard that police arrested people prior to the start of Curfew the night before.

494.    Moore knew the Curfew time had been changed, and was set to start at 8 p.m. that night, due to a notification she received on her cell phone.

495.    Moore and her friend went up to one of the police lines and tried to cross through so she could head toward her car, which was parked in a lot downtown.

496.    The police officers at the line told her she was "going the wrong way." When she explained that she was trying to get to her car, and the location of her car, they told her, "You can't go this way."

497.    Moore said, "It's not curfew yet, what do you mean?" The John Doe Officer responded by pointing down the road back toward the marching protesters, indicating that she must head toward the group she had just tried to leave. They told her to "run" as they pointed.

498.    Moore did not run, but did rejoin the group, without any avenue available to her to exit the area or to head to her car.

499.    Just before the Curfew period was set to start, the protest marching group stopped in an intersection. John Doe Officers were lined up across all nearby streets and alleys, and left only two streets open for the protesters to continue walking – away from the direction of Moore's car.

500.    Based on reports of the events of the night before, Moore and others in the group became afraid that they were about the be subject to unwarranted police brutality. They knew that the police were preventing them from leaving the area.

501.    Suddenly, without warning of any kind, chaos erupted as John Doe Officers rapidly began to move in on the group and police K-9 units descended upon them.

502.    Moore and her friends attempted to leave the area through a nearby wooded area. While trying to leave, one of Moore's friends fell and hurt his ankle. He struggled to get up and walk, and Moore and her other friend attempted to help him. Moore began administering aid.

503.    A group of John Doe Officers approached Moore and her friends and arrested them, placing their hands in zip ties, and walking them down the hill, where the officers sat them on the curb and took off their face masks worn to prevent COVID-19 transmission.

504.    All of the John Doe Officers in this area wore uniforms devoid of badges, nameplates, and any other identifying information. None of them had body cameras.

505.    Moore attempted to learn the identities of these officers, and nine separate John Doe Officers obstructed her requests when they all told her their last names were Smith, and would provide no other information.

506.    After a substantial amount of time sitting on the curb, Moore and her friends were transported in police vans to the HCJC.

507.    Once they arrived at the HCJC, Moore and dozens of others were walked into the Sallyport area, where they were made by Defendants to sit shoulder-to-shoulder along the wall, without masks.

508.    During the lengthy period of time that protesters, including Moore, were held on the streets of Over the Rhine and in the vans, and in the HCJC Sallyport, they were deprived by Defendants of access to toilets, water, food, necessary medications, or blankets or adequate clothing, and other basic human needs.

509.    Arrested persons were called one-by-one for processing into the HCJC.

510.    By the time Moore was finally processed into the jail and taken to a cell for the night, it was 1 a.m. on June 2, 2020.

511.    During the processing period, Moore was formally charged with Misconduct at Emergency.

512.    Defendant CPD officer R. Utecht (P 419), "processing officer," completed the complaint against Moore for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

513.    The name of Defendant PO J. Mendoza (P395) likewise appeared on the complaint, written by Defendant Utecht.

514.    Neither Defendant Utecht nor Defendant Mendoza had probable cause to charge Moore with any crime, but both CPD officers nonetheless instigated, influenced, and/or participated in the decision to charge her with Misconduct at Emergency.

515.    Once in her cell, Moore could see through her window into the Sallyport area. Moore was unable to sleep, and saw that other arrested protesters remained outdoors in the Sallyport during the early morning hours.

516.    The next morning, HCJC John Roe Officers woke Moore and she was arraigned.

517.    Moore was forced to suffer the burden of facing ongoing prosecution over the next several months, which had a significant impact on her ability to work in her field.

518.    Moore did not return to protests during this time. Her arrest and prosecution affected and continue to affect her, causing her concern for her rights and safety during other protests.

519.    On July 7, 2020, counsel for Moore filed a Motion to Dismiss the pending criminal charges as part of the common defense.

520.    On March 18, 2021, Hamilton County Municipal Judge Gwen Bender denied the Motion.

521.    On April 8, 2021, the State conceded that it could not satisfy its discovery obligations under Ohio Crim. R. 16.

522.    On April 19, 2021, upon the State's request, the court dismissed charges against Moore, concluding the prosecution of Moore in this matter.

### Maurice Kenny

523.    Maurice Kenney is a 33-year-old Black man, and is an artist and performer.

524.    Kenney joined protests in Cincinnati with his then-girlfriend on Saturday, May 30, Sunday May, 31, and Monday, June 1, 2020. They participated in marches and rallies at various locations throughout downtown Cincinnati.

525.    On each of these days, Kenney and his girlfriend specifically planned each day to leave the protests prior to the onset of the Curfew.

526.    On May 30 and 31, 2020, Kenney attended protests without incident, and was able to return home prior to the beginning of the Curfew period.

527.    Kenney was aware that the Curfew for May 31 and June 1 was supposed to start at 9 p.m.

528.     On June 1, 2020, Kenney and his girlfriend joined the protests in the afternoon, and marched and rallied with large groups of people at the Hamilton County Common Pleas Courthouse, Fountain Square, City Hall, and a CPD station, among other locations.

529.     Kenney never received any notification or information from any source that the Curfew time had changed and would begin at 8 p.m. on Monday June 1, 2020.

530.     On June 1, Kenney and his girlfriend began to head home at the time they believed to be over one hour before the onset of the Curfew period. They walked through Over the Rhine with a group of protesters who happened to be marching in the general direction of Kenney's home, which was in the West End neighborhood.

531.     As they reached the area on or about the five-point intersection of Vine Street, McMicken Avenue, and Findlay Street, Kenney noticed that John Doe Officers were suddenly visible all around, blocking streets and preventing protesters from traveling down certain roadways.

532.     The police lines and blocked roads forced the group to turn onto McMicken Avenue.

533.     Kenney and his girlfriend continued walking with the group down McMicken Avenue, toward Kenney's home, to get home before the Curfew began.

534.     All of a sudden, without warning of any kind, before 8 p.m., Kenney heard loud booming noises. It was clear to Kenney that the noises signified that the police were coming to arrest everyone in the protest group.

535.     Kenney believed he still had time to get home before the Curfew began, and he and his girlfriend attempted to run toward the direction of his home.

536.     Out of fear, Kenney then attempted to knock on the door of a home nearby, to seek refuge from the quickly-advancing police and police dogs. No one answered, and so

Kenney and his girlfriend sat down, knowing they would not be able to make it home. They waited for police, who were rapidly approaching them, to arrive.

537.    John Doe Officers arrested Kenney and his girlfriend, placed them in zip tie handcuffs, took off their face masks worn to prevent COVID-19 transmission, and sat them on the curb. Kenney was forced to wait on the curb for a significant length of time before being loaded onto a bus.

538.    The bus, once full of arrested protesters, then transported them to an underground transit station.

539.    After waiting at the transit station for some time, a CPD officer boarded the bus and said, "Merry Christmas, y'all. Y'all get to go because of the events of last night," presumably referring to the abusive conditions of confinement in the Sallyport at the HCJC which had been broadcast by media earlier on June 1.

540.    After this announcement, protesters were removed from the bus one-by-one for processing.

541.    During the lengthy period of time that protesters, including Kenney, were held on the streets of Over the Rhine and on the buses, Defendants deprived them of access to toilets, water, food, necessary medications, or blankets or adequate clothing, and other basic human needs.

542.    Kenney eventually was removed from the bus and was formally charged by Defendants with Misconduct at Emergency.

543.    Defendant CPD officer K. Horning (P917), "processing officer," completed the complaint against Kenny for Misconduct at Emergency despite having no probable cause and no personal knowledge of the events allegedly giving rise to the complaint.

544.    Defendant PO Kelsey P425's name likewise appeared on the complaint, written by Defendant Horning.

545.     Neither Defendant Kelsey nor Defendant Horning had probable cause to charge Kenney with any crime, but both CPD officers nonetheless instigated, influenced, and/or participated in the decision to charge him with Misconduct at Emergency.

546.     Once Kenney and his girlfriend were finally processed and provided with charging paperwork, they were released into the night to make their way home.

547.     Metro buses were not operating at this time, and Kenney and his girlfriend were forced to walk all the way back to his home in the West End.

548.     Kenney subsequently attended his arraignment hearing at court, and was forced to suffer the burden of facing ongoing prosecution over the next several months.

549.     Though Kenney did return to protest the following weekend, the police conduct prior to his arrest, and his arrest and prosecution, affected and continue to affect him, causing him concern for his rights and safety during other protests.

550.     On July 7, 2020, counsel for Kenney filed a Motion to Dismiss the pending criminal charges as part of the common defense.

551.     On December 3, 2020, Hamilton County Municipal Judge Ted Berry granted Kenney's Motion to Dismiss, and dismissed all charges against Kenney.

552.     The City appealed the dismissal, but then dismissed their pending appeal.

553.     The case returned to the trial court on May 21, 2021, and on the same day, the City filed an Entry of Voluntary Dismissal, concluding the prosecution of Kenney in this matter.

## CLASS ACTION ALLEGATIONS

### Rule 23(b)(2), Injunctive Relief Class

554.     **Class Definition, Rule 23(b)(2), Injunctive Relief Class**: This class is defined as all persons who were subjected to physical arrest in the City of Cincinnati from

May 29 through June 8, 2020 as a result of their exercise of their rights of free speech, press, assembly, and petition in general.

**Rule 23(b)(3), First Amendment Violations Class**

555. **Class Definition, Rule 23(b)(3), First Amendment Violations Class**: One or more of the named Plaintiffs who are indicated for each class or subclass bring this action individually and on behalf of a proposed class of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), and (b)(3). These classes are defined as:

a. **Use of Force Subclass:** Beginning May 29, 2020, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests in the City of Cincinnati from May 29 through June 8, 2020, who were subjected indiscriminately and without individualized probable cause to so-called "less-lethal" weapons and/or to inhalation of an aerosolized chemical agent (including, but not limited to, CS or OC). Less-lethal weapons for purposes of this definition include 40 Millimeter Rounds, Beanbag Rounds, Tasers, Pepperball Rounds, Tear Gas, rubber or plastic bullets, or any other weapon or device purportedly deployed by CPD and/or its officers/agents for crowd control or compliance purposes and subsequently arrested in connection with their presence there. The Class Representatives for this class are Mary Zeiser, Paula Bennett, Chase Butler, Paulina Prokhorova, Suann Lockard, Zoe Keller, Arianna Hicks, Andrew Amrein, and Kimberly Calloway.

b.     **Arrest and Prosecution Subclass**: Beginning May 30, 2020, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests in the City of Cincinnati, who were arrested from May 30 through June 8, 2020 by the CPD and/or its officers/agents for violating the Curfew and charged with Misconduct at Emergency, and such prosecutions were dismissed. Excluded from this Subclass are all persons who were convicted of, plead guilty to, and/or plead no contest to Misconduct at Emergency or other charges for Curfew violations, all persons who signed agreements wherein the City promised dismissal of Misconduct at Emergency charges in exchange for waiver of claims of civil rights violations, where such agreements resulted in dismissal of charges, and all persons who were charged at the time of arrest and processing with any offense other than Misconduct at Emergency. The Class Representatives for this Subclass are Mary Zeiser, Chase Butler, Paulina Prokhorova, Paula Bennett, Suann Lockard, Arianna Hicks, Andrew Amrein, Kimberly Calloway, Quinn Moore, and Maurice Kenney.

c.     **Conditions of Confinement Subclass:** Beginning May 30, 2020, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests in the City of Cincinnati, who were arrested on May 30 through June 1, 2020 by the CPD and/or its officers/agents for violating the Curfew and charged with Misconduct at Emergency, and were held in transport vehicles,

the HCJC Sallyport, and/or transit centers without access to water, toilets, food, necessary medications, and/or blankets. The Class Representatives for this Subclass are Zoe Keller, Suann Lockard, Arianna Hicks, Andrew Amrein, Kimberly Calloway, Quinn Moore, and Maurice Kenney.

d. **Property Seizure Subclass:** Beginning May 30, 2020, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests in the City of Cincinnati, who were arrested from May 30 through June 8, 2020 by the CPD and/or its officers/agents for violating the Curfew and charged with Misconduct at Emergency, taken into custody, and whose property was seized by Defendants and unlawfully never returned. Excluded from this Subclass are all persons who were convicted of, plead guilty to, and/or plead no contest to Misconduct at Emergency or other charges for Curfew violations, all persons who signed agreements wherein the City promised dismissal of Misconduct at Emergency charges in exchange for waiver of claims of civil rights violations, where such agreements resulted in dismissal of charges, and all persons who were charged at the time of arrest and processing with any offense other than Misconduct at Emergency. The Class Representatives for this Subclass are Mary Zeiser and Paula Bennett.

556. Plaintiffs and the putative Classes and Subclasses were subjected to the constitutional violations described in this Complaint. The legal and factual issues are common to the Class and Subclasses and affect all Class and Subclass members.

557.    Plaintiffs reserve the right to amend or modify the Class and Subclass definitions with greater specificity or division after having had an opportunity to conduct discovery.

## Numerosity

558.    Each Class and Subclass are inclusive of people present to protest and those otherwise present in the vicinity as bystanders, journalists, legal observers, or medics.

559.    Consistent with Federal Rule of Civil Procedure 23(a), the members of the Class are so numerous that joinder of all members is impracticable.

## Common Issues of Fact or Law

560.    Although the actions complained of in this Complaint occurred at different times and locations, Defendants acted uniformly with respect to each Class and Subclass. For example, Defendants consistently tear gassed and shot projectiles at peaceful protestors without warning, orders, or any lawful justification.

561.    Plaintiffs are informed and believe and thereon allege that the CPD officers and other officer agents of CPD acted in accordance with orders given by supervisors from the highest command positions, in accordance with policies and procedures instituted by the CPD and the City.

562.    There are questions of law and fact common to the Classes and Subclasses and they predominate over individualized questions. These common questions of fact and law include, but are not limited to:

　　a.  Did Defendants enforce the Curfew in a discriminatory and
        unconstitutional manner, in violation of the First Amendment?

　　b.  Did Defendants routinely break up protests without warning and
        without providing directions, means, and opportunity to disperse

before taking aggressive and injurious—potentially deadly—police action?

c. Did Defendants routinely break up protests through the use of force without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force?

d. Did Defendants kettle and/or detain persons in a discriminatory and unlawful manner?

e. Did Defendants arrest and prosecute persons, and continue such prosecutions, without probable cause?

f. Did Defendants deprive people in custody of toilets, water, food, blankets or adequate clothing, shelter, necessary medication, and other basic human needs in violation of pretrial detainees' Fourth and Fourteenth Amendment rights?

g. Did Defendants systematically deprive arrested persons of their personal property in the course of arrest and fail to return the same?

h. Did the Defendant City impose a Curfew without accommodating, or attempting to accommodate, the right to peaceable assembly and protest?

i. Must Defendants, when imposing a curfew based on some present at a protest that is unlawful, accommodate, or attempt to accommodate, the right to peaceably assemble and protest?

j. Must Defendants, when enforcing a curfew, enforce it in a manner that does not discriminate against protestors in violation of the First and Fourteenth Amendments?

k. Must Defendants, when dispersing assemblies or protests, provide adequate warning and provide both directions, means, and opportunity to disperse before taking aggressive and injurious—potentially deadly—police action?

l. Did Defendants routinely break up protests through the use of force or use force against protestors without regard to whether the individuals against whom such force was used, without regard to whether the individuals were engaged in conduct justifying such force, in violation of the First, Fourth, or Fourteenth Amendments?

m. Did Defendants' conduct complained of herein infringe upon demonstrators' constitutional rights to be free of excessive force, to peaceably assemble, to freedom of expression, to be free from unreasonable searches, seizures, and prosecutions, to due process and equal protection, and to be free from inhuman conditions of confinement?

n. Did some or all of the conduct described above constitute a policy, practice, or custom of the Defendant City or Defendant County?

o. Did the City and/or County manifest a failure to provide adequate policies and procedures and/or to adequately train and supervise their officers and/or employees/agents on some of all of the above conduct and related constitutional limitations?

p. Did the City and/or County exhibit deliberate indifference to the unconstitutional conduct complained of herein?

q. Are there class-wide damages available to the various Classes and Subclasses?

563.    Defendants infringed the First Amendment rights of the putative Classes and Subclasses as a group and treated all similarly, acting on grounds applicable to the putative Classes and Subclasses. The named Plaintiffs' claims that First, Fourth, and Fourteenth Amendment rights were violated raise common questions of law and fact. The Defendants have acted, threaten to act, and will continue to act on grounds generally applicable to the Classes and Subclasses, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

## Typicality

564.    Consistent with Federal Rule of Civil Procedure 23(a), the claims of the representative Plaintiffs are typical of the Classes and Subclasses. Plaintiffs were all present at the protests in the City of Cincinnati; were subjected to one or more of the violations previously enumerated; and seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future.

565.    Thus, Plaintiffs have the same interests and have suffered the same type of damages as the Class and Subclass members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the Class and Subclass members. Each Class and Subclass member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs are similar in type to the actual damages suffered by each Class and Subclass member although the severity of those injuries may vary among Class and Subclass members.

566.    Consistent with Federal Rule of Civil Procedure 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the Class and Subclass. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the Classes and Subclasses.

## Adequate Representation

567.     The named Plaintiffs will fairly and adequately represent the common Class and Subclass interest. The named Plaintiffs have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the Plaintiff class, and they will fairly and adequately protect the interests of the Classes and Subclasses.

568.     The named Plaintiffs are presented by counsel and law firms who are well-experienced in civil rights litigation, and specifically in protest, police, and jail misconduct litigation, and in class action litigation, and are familiar with the issues in this case.

a.     The law firm of Friedman Gilbert + Gerhardstein ("FG+G") has decades of history litigating protest, police, and jail misconduct cases. FG+G counsel for Plaintiffs and Class herein have litigated, won at trial, and settled numerous police misconduct cases involving constitutional issues including false arrests, malicious prosecutions, and excessive force, including multi-million dollar settlements. *See*, e.g., *Bridgeman, et al. v. City of Cleveland, et al.*, USDC N.D. Ohio, Consolidated Case Nos. 1:15-CV-01320 and 1: :15-CV-00989 ($18.5 million settlement); *Smith v. Jones*, USDC N.D. Ohio No. 1:13-CV-744 ($5.5 million jury verdict); *Rolen v. City of Cleveland, et al.*, USDC N.D. Ohio No. 1:12-CV-1914 ($2.25 million settlement); *Tyree, et al. v. Colas*, Va. Cir. Court No. CL-19-6418 ($1 million jury verdict). In 2017, FG+G counsel for Plaintiffs and Class herein litigated and settled a lawsuit on behalf of protesters whose constitutional rights were violated by the City of Cleveland during a 2015 mass arrest of Black Lives Matter demonstrators. *Workman, et al. v. City of Cleveland, et al.*, USDC N.D. Ohio No. 1:17-CV-01074. FG+G recently settled litigation on behalf of a man who was

unlawfully arrested and prosecuted for May 2020 curfew violations in the City of Cleveland. *Mollahassani v. City of Cleveland, et al.,* USDC N.D. Ohio No. 1:21-cv-00208. FG+G counsel for Plaintiffs and Class herein are currently litigating multiple cases for police misconduct during May 2020 protests, including *Pratt, et al. v. City of Toledo, et al.*, USDC N.D. Ohio No. 3:21-cv-01111, *Belokon, et al. v. City of Cleveland, et al.*, USDC N.D. Ohio No. 1:21-cv-1104, and *Bernard, et al. v. City of Cleveland, et al.,* USDC N.D. Ohio No. 1:21-cv-1103. In addition, FG+G counsel for Plaintiffs and Class herein have also litigated and settled numerous cases concerning constitutional claims in jail settings, including but not limited to claims on behalf of the Estate of Alexander Rios ($4 million settlement prior to suit in 2021), and *Schwartz v. Clermont County, et al.*, USDC S.D. Ohio No. 1:19-cv-453 ($750,000 settlement), and are currently litigating a class action against Cuyahoga County, Ohio for unconstitutional conditions of confinement claims in *Clay, et al. v. Cuyahoga County, et al.*, USDC N.D. Ohio No. 1:18-cv-2929.

b.      The law firm of Santen and Hughes has extensive experience in class action litigation, representing both plaintiffs and defendants: *Pansiera v. The Home City Ice Company,* Case No. 1:19-cv-01042 (S.D. Ohio); *Uren v. Scoville*, Case No. A 1406892 (Ham. Cty. C.P.); *Khoo-Smith v. Nelson*, Case No. A 1601144 (Ham. Cty. C.P.); *Khoo-Robinson v. Willner*, Case No. A 1401348 (Ham. Cty. C.P.); *Asmus v. Winton Woods*, Case No. A1704933, (Ham. Cty. C.P.); *Thomas v. Papa John's International, Inc.*, Case No. 17-cv-411-MRB (S.D. Ohio). Santen & Hughes also has exhaustive experience in criminal defense, in cases ranging from misdemeanors to capital cases, in all phases of litigation

from pretrial proceedings, plea negotiations, jury trials, bench trials, appeals and post-conviction. Santen & Hughes has also served as plaintiff's counsel in numerous civil right cases arising from police misconduct. *Vieh v. Smythe, et al.*, Case no. 1:13-cv-877 (S.D. Ohio); *Jordan v. City of Cincinnati*, Case no. 12-cv-884 (S.D. Ohio); *Hicks v. Scott*, Case no. 1:16-cv-621 (S.D. Ohio).

569.    Counsel for the named Plaintiffs know of no conflicts among the between members of the Classes and Subclasses, the named Plaintiffs, or the attorneys in this action.

## Maintenance and Superiority

570.    Consistent with Federal Rule of Civil Procedure 23(b)(1)(A), prosecutions of separate actions by individual members of the Classes and Subclasses would create a risk that inconsistent or varying adjudications with respect to individual members of the Classes and Subclasses would establish incompatible standards of conduct for the parties opposing the Classes and Subclasses.

571.    Consistent with Federal Rule of Civil Procedure 23(b)(1)(B), prosecutions of separate actions by individual members of the Classes and Subclasses would create a risk of adjudications with respect to individual members of the Classes and Subclasses which would, as a practical matter, substantially impair or impede the interests of the other members of the Classes and Subclasses to protect their interests.

572.    Consistent with Federal Rule of Civil Procedure 23(b)(2), Defendants have acted on grounds generally applicable to the Classes and Subclasses.

573.    Consistent with Federal Rule of Civil Procedure 23(b)(3), the questions of law or fact common to the members of the Classes and Subclasses predominate over any questions affecting only individual members, and this class action is superior to other

84

available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and allege thereon, that the interests of Class and Subclass members in individually controlling the prosecution of a separate action is low in that most Class and Subclass members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, *i.e.*, the City of Cincinnati and Hamilton County. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

574.    Plaintiffs do not know the identities of most Class and Subclass members. Plaintiffs are informed and believe, and thereon allege, that the identities of the Class and Subclass members are ascertainable in significant part from City, CPD, County, HCJC, HCSO, and Hamilton County Municipal Court records, at least as it relates to those Class and Subclass members who were detained, arrested, prosecuted, and held in custody. Plaintiffs are informed and believe, and thereon allege, that a significant number of Class and Subclass members may be reached by the use of outreach efforts by organizations that participated in organizing the affected protests.

575.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The class action is superior to any other available means to resolve the issues. Liability can be determined on a classwide basis. General damages can also be determined on a classwide basis.

576.    Consistent with Rule 23(b)(3), Class and Subclass members must be furnished with the best notice practicable under the circumstances, including individual

notice to all members who can be identified through reasonable effort. Plaintiffs are informed and believe that City, CPD, County, HCJC, and/or HSCO computer records contain a last known address for class members who were detained, arrested, prosecuted, and held in custody. Plaintiffs contemplate that individual notice be given to Class and Subclass members at such last known address by first class mail, email, and cell phone outreach, social media, and efforts of organizations that organized the protests.

577.   Pursuant to Rule 23(c)(4), particular issues are appropriate for certification—namely the issues described in paragraph 561, above, because resolution of such issues would advance the disposition of the matter and the parties' interests therein.

### DAMAGES

578.   As a direct and proximate cause of the conduct described herein, the named Plaintiffs and Class and Subclass members have been denied their constitutional rights as stated herein, and have suffered damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety, and other damages.

579.   Defendants' and their employees/agents' actions were done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs', Class members', and Subclass members' rights.

580.   One or more named Plaintiffs, Class members, and Subclass members have a reasonable fear of attending protests in Cincinnati in the future due to the cumulative effect of violence and misconduct by the Defendants and their employees/agents.

581.   Without intervention by this Court, the Injunctive Relief Class members, who have participated in and wish to participate or attend protest activities, particularly related to police brutality, are at risk of having their rights violated in the future due to the

Defendants' demonstrated pattern of constitutional violations and threatened future actions.

582.    The Injunctive Relief Class has no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this Court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief.

583.    The Injunctive Relief Class is represented by each of the individual Class and Subclass representatives.

584.    Defendants have acted and refused to act on grounds generally applicable to the putative Classes and Subclasses. Injunctive and declaratory relief for the putative Classes and Subclasses as a whole is appropriate.

585.    Defendants' policies, practices, customs, conduct, and acts alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein. The Plaintiffs and Class and Subclass members intend in the future to exercise their constitutional rights of freedom of the press, speech, and assembly by engaging in expressive activities in the City of Cincinnati and Hamilton County. Defendants' conduct described herein has created uncertainty among Plaintiffs with respect to their exercise now and in the future of these constitutional rights, and has chilled their exercise of these rights.

586.    Specifically, Plaintiffs are concerned that they will be subjected unlawful force, kettling, detentions, arrests, prosecutions, conditions of confinement, and property seizures by the CPD and its officers/agents, and to unlawful conditions of confinement by the County and its officers/agents.

587.    Plaintiffs are also concerned that, when engaged in or documenting protest activities, Defendants will again impose Curfews without accommodating or attempting to

accommodate First Amendment rights; will not provide adequate notice before attempting to disperse assemblies; will not provide adequate means and opportunity to disperse; and will again employ indiscriminate, unreasonable or excessive force, injuring and terrifying protestors.

588.    Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

## COUNT 1
### 42 U.S.C. § 1983 – First Amendment
### against all Defendants

589.    All of the foregoing paragraphs are incorporated as though fully set forth here.

590.    Defendants and their employees/agents violated Plaintiffs' and the First Amendment Violations Class members' rights under the First Amendment of the United States Constitution.

591.    Further, during the constitutional violations described in this Count, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' and the First Amendment Violations Class members' constitutional rights, even though they had the opportunity to do so.

592.    In the manner described more fully above, the Defendant City's Curfew was unconstitutional on its face and as applied.

593.    The City adopted an official policy of selectively enforcing the Curfew against protestors and people near protesters. This was designed to further suppress Plaintiffs' and First Amendment Violations and Arrest and Prosecutions Subclass members' protected First Amendment activities including but not limited to the right to free speech, expression, and assembly, and it violated the First Amendment.

594.    The Defendant City's Curfew also violated the First Amendment in that, as applied, it provided no exceptions for First Amendment-protected protest activity.

595.    In the manner described more fully above, Defendants violated Plaintiffs' and First Amendment Violations Class and Use of Force Subclass members' First Amendment rights when they attempted to control and break up the peaceful protests by using weapons on and/or kettling the Plaintiffs and Class/Subclass members without warning, dispersal orders, adequate time to disperse, or any lawful justification whatsoever.

596.    These actions were undertaken in order to discourage and suppress the exercise of Plaintiffs' and First Amendment Violations Class and Use of Force Subclass members' First Amendment rights.

597.    Defendants' and their employees'/agents' actions in using weapons on protestors and nearby people in order to control and suppress speech violated the First Amendment rights of Plaintiffs' and First Amendment Violations Class and Use of Force Subclass members.

598.    In the manner described more fully above, Defendants violated Plaintiffs' and First Amendment Violations Class and Conditions of Confinement Subclass members' First Amendment rights when they held people arrested for Curfew violations in unconstitutional conditions of confinement in response to their First Amendment activities.

599.    These actions were undertaken in order to discourage and suppress the exercise of Plaintiffs' and First Amendment Violations Class and Conditions of Confinement Subclass members' First Amendment rights.

600.    In the manner described more fully above, Defendants violated Plaintiffs' and First Amendment Violations Class and Property Seizure Subclass members' First Amendment rights when they seized arrested protestors' property and unlawfully failed to

return said property, or provide a means for tracking and administration of said property in response to their First Amendment activities.

601.     These actions were undertaken in order to discourage and suppress the exercise of Plaintiffs' and First Amendment Violations Class and Property Seizure Subclass members' First Amendment rights.

602.     The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendants City and County. The policies, practices, and customs of the Defendants City and County were the moving force behind the misconduct described in this Count and the violations of Plaintiffs' and First Amendment Violations Class and Subclasses members' rights.

603.     The Defendants City and County are liable because the violation of Plaintiffs' and First Amendment Violations Class and Subclasses members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendants City and County in that the violation of Plaintiffs and Class and Subclass' members rights described in this Count was committed by the relevant final policymaker for the City and/or County, or the persons to whom final policymaking authority had been delegated.

604.     In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle First Amendment activity as described in this Count was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City and County can reasonably be said to have been deliberately indifferent to the need.

605.     The widespread practices were so well settled as to constitute *de facto* policy in the City and County, and they were allowed to exist because municipal policymakers

with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

606.    As a direct and proximate result of Defendants and/or their employees/agents' actions, Plaintiffs' and Class and Subclass members' constitutional rights were violated, entitling them to relief.

607.    Defendants are jointly and severally liable for this conduct.

**COUNT 2**
**42 U.S.C. § 1983 – First Amendment – Retaliation for**
**Exercise of First Amendment Rights**
**against All Defendants**

608.    All of the foregoing paragraphs are incorporated as though fully set forth here.

609.    The Plaintiffs herein and First Amendment Violations Class members were all engaging in, or attempting to engage in activities protected by the First Amendment to the United States Constitution at the time of their arrest.

610.    The protests and demonstrations that took place between May 29, 2020 and June 8, 2020 had as their focus an opposition to police brutality against Black people and people of color, and sought reform and/or change in policing and government.

611.    In the drafting, enactment, execution, and enforcement of the Curfew, the Defendants acted with a retaliatory motive against the Plaintiffs and First Amendment Violations Class members on account of their acts of protesting against and petitioning the government for change.

612.    During the enforcement of the Curfew, Defendants routinely identified and arrested persons perceived to be participating in or leading protests, even as they gave warnings to and declined to take action against other persons who were physically present at the same times and places.

613.     During the enforcement of the Curfew, Defendants regularly deployed so-called "less lethal" weapons against persons perceived to be participating in or leading peaceful and lawful protests, even as they took no action against other persons who were physically present at the same times and places.

614.     In carrying out the enforcement of the Curfew and the hundreds of arrests that were made for alleged violation of the Curfew, Defendants engaged in selective enforcement against the Plaintiffs and First Amendment Violations Class members as retaliation against them on account of their acts of protesting against and petitioning the government for change.

615.     In carrying out the enforcement of the Curfew and the hundreds of arrests that were made for alleged violation of the Curfew, Defendants used in excessive force against the Plaintiffs and First Amendment Violations Class and Use of Force Subclass members as retaliation against them on account of their acts of protesting against and petitioning the government for change.

616.     In carrying out the enforcement of the Curfew and the hundreds of arrests that were made for alleged violation of the Curfew, Defendants imposed unconstitutional conditions of confinement, in violation of Plaintiffs' and First Amendment Violations Class and Conditions of Confinement Subclass members' rights under the Fourth and Fourteenth Amendments to the United States Constitution, and subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this complaint.

617.     In seizing and mishandling the personal property of Plaintiffs and First Amendment Violations Class and Property Seizure Subclass members, Defendants acted in retaliation against the Plaintiffs and First Amendment Violations Class members on account of their acts of protesting against and petitioning the government for change.

618.    Defendants retaliated against Plaintiffs and First Amendment Violations Class and Subclass members solely because they had chosen to exercise their First Amendment rights in support of a specific cause, against police brutality.

619.    Plaintiffs' and First Amendment Violations Class and Subclass members' acts of engaging in protected First Amendment activities was the cause of Defendants' retaliation.

620.    Further, during the constitutional violations described in this Count, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' and the Class and Subclass members' constitutional rights, even though they had the opportunity to do so.

621.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendants City and County. The policies, practices, and customs of the Defendants City and County were the moving force behind the misconduct described in this Count and the violations of Plaintiffs' and First Amendment Violations Class and Subclasses members' rights.

622.    The Defendants City and County are liable because the violation of Plaintiffs' and First Amendment Violations Class and Subclasses members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendants City and County in that the violation of Plaintiffs and Class and Subclass' members rights described in this Count was committed by the relevant final policymaker for the City and/or County, or the persons to whom final policymaking authority had been delegated.

623.    In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle First Amendment activity as described in this

Count was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City and County can reasonably be said to have been deliberately indifferent to the need.

624.    The widespread practices were so well settled as to constitute *de facto* policy in the City and County, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

625.    As a direct and proximate result of Defendants and/or their employees/agents' actions, Plaintiffs' and Class and Subclass members' constitutional rights were violated, entitling them to relief.

626.    Defendants are jointly and severally liable for this conduct.

**COUNT 3**
**42 U.S.C. § 1983 – Fourth Amendment**
**against Defendants City, Cranley, Duhaney, Isaac, and**
**the CPD Officer Defendants**

627.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

628.    Defendants and their employees/agents violated Plaintiffs' and Use of Force Subclass members' rights to be free from unreasonable and excessive force under the Fourth Amendment when Defendant Officers kettled or caused kettling of them, or used or caused the use of weapons on them while they presented no threat and without an individualized determination of individual conduct justifying such force, or used or caused the use of such weapons specifically to suppress their expressive activity.

629.    In the manner described more fully above, Defendants and their employees/agents violated Plaintiffs' and the Arrest and Prosecution Subclass members'

rights to be free from unreasonable seizure when they detained and/or caused the detention of Plaintiffs and Subclass members without lawful justification.

630. In the manner described more fully above, Defendants and their employees/agents violated Plaintiffs' and the Property Seizure Subclass members' rights to be free from unreasonable seizure when they seized and/or caused the seizure of property of Plaintiffs and Subclass members without any claim that the same were subject to seizure or used as instrumentalities of any crime, and failed to return said property, the same being without lawful justification and in violation of due process.

631. Further, during the constitutional violations described in this Count, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' and the Use of Force and Arrest and Prosecution Subclasses' members' constitutional rights, even though they had the opportunity to do so.

632. The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights.

633. The Defendant City is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant City and the CPD in that the violation of Plaintiffs and Subclass' members rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

634. In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle seizures and use of force as described in this Count

was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

635.    The widespread practices were so well settled as to constitute *de facto* policy in the City and CPD, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

636.    As a direct and proximate result of Defendants and/or their employees/agents' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to relief.

637.    Defendants are jointly and severally liable for this conduct.

**COUNT 4**
**42 U.S.C. § 1983 – Fourteenth Amendment: Due Process and Equal Protection**
**against Defendants City, Cranley, Duhaney, Isaac, and**
**the CPD Officer Defendants**

638.    All of the foregoing paragraphs are incorporated as though fully set forth here.

639.    In the manner described more fully above, Defendants and their employees/agents violated Plaintiffs' and the Use of Force Subclass members' rights to due process when they affirmatively and indiscriminately used weapons Plaintiffs and class members without lawful justification. Furthermore, this conduct was deliberately indifferent to the Plaintiffs and class members' rights, shocks the conscience, and violated the decencies of civilized conduct, under the Fourteenth Amendment.

640.    In the manner described more fully above, Defendants and their employees/agents violated Plaintiffs' and the Arrest and Prosecution Subclass members' rights to due process when they affirmatively and indiscriminately kettled and arrested

Plaintiffs and Subclass members without lawful justification. Furthermore, this conduct was deliberately indifferent to the Plaintiffs and Subclass members' rights, shocks the conscience, and violated the decencies of civilized conduct, under the Fourteenth Amendment.

641.    In the manner described more fully above, Defendants and their employees/agents violated Plaintiffs' and the Arrest and Prosecution Subclass members' rights to due process when they seized and never returned property without due process and without lawful justification. Furthermore, this conduct was deliberately indifferent to the Plaintiffs and Subclass members' rights, shocks the conscience, and violated the decencies of civilized conduct, under the Fourteenth Amendment.

642.    In the manner described more fully above, Defendants and their employees/agents violated Plaintiffs' and Arrest and Prosecution Subclass members' rights to due process and equal protection when they arrested them for violation of the curfew.

643.    Further, during the constitutional violations described in this Count, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' and the Use of Force and Arrest and Prosecution Subclasses' members' constitutional rights, even though they had the opportunity to do so.

644.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights.

645.    The Defendant City is liable because the violation of Plaintiffs' and Subclass members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant City and the

CPD in that the violation of Plaintiffs and the Arrest and Prosecution Subclass' members rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

646.    In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle Due Process and Equal Protection as described in this Count was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

647.    The widespread practices were so well settled as to constitute *de facto* policy in the City and CPD, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

648.    As a direct and proximate result of Defendants and/or their employees/agents' actions, Plaintiffs' and Subclass members' constitutional rights were violated, entitling them to relief.

649.    Defendants are jointly and severally liable for this conduct.

### COUNT 5
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments: False Arrest against Defendants City, Cranley, Duhaney, Isaac, and the CPD Officer Defendants

650.    All of the foregoing paragraphs are incorporated as though fully set forth here.

651.    In the manner described more fully above, Defendants and their employees/agents caused Plaintiffs and the Arrest and Prosecution Subclass' members to be unreasonably seized, detained, imprisoned, and deprived of liberty without probable cause

to believe that they had committed a crime, in violation of their rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

652. In the manner described more fully above, Defendants and their employees/agents violated Plaintiffs' and Arrest and Prosecution Subclass members' rights under the Fourth and Fourteenth Amendments by arresting them.

653. Further, during the constitutional violations described in this Count, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' and the Arrest and Prosecution Subclass members' constitutional rights, even though they had the opportunity to do so.

654. The Defendants and/or their employees/agents are liable because the violation of Plaintiffs and the Arrest and Prosecution Subclass' members rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

655. The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and Subclass members' rights.

656. The Defendant City is liable because the violation of Plaintiffs' and Subclass members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant City and the CPD in that the violation of Plaintiffs and the Arrest and Prosecution Subclass' members rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

657.     In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle arrests as described in this Count was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

658.     The widespread practices were so well settled as to constitute *de facto* policy in the City and CPD, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

659.     As a direct and proximate result of Defendants' actions, Plaintiffs' and Subclass members' constitutional rights were violated, entitling them to relief.

660.     Defendants are jointly and severally liable for this conduct.

## COUNT 6
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments: Malicious Prosecution against Defendants City, Cranley, Duhaney, Isaac, and the CPD Officer Defendants

661.     All of the foregoing paragraphs are incorporated as though fully set forth here.

662.     In the manner described more fully above, Defendants and their employees/agents, acting individually, jointly, and in conspiracy with each other, instigated, influenced, or participated in the decision to prosecute Plaintiffs and the Arrest and Prosecution Subclass members, and there was no probable cause for the criminal prosecution.

663.     As a consequence of the criminal prosecution, Plaintiffs and the Arrest and Prosecution Subclass members suffered a deprivation of liberty apart from their initial seizures.

664. Plaintiffs' and the Arrest and Prosecution Subclass members' criminal prosecutions were terminated in their favor.

665. In the manner described more fully above, Defendants and their employees/agents violated Plaintiffs' and Arrest and Prosecution Subclass members' rights under the Fourth and Fourteenth Amendments by engaging in the misconduct described in this Count.

666. Further, during the constitutional violations described in this Count, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' and the Arrest and Prosecution Subclass members' constitutional rights, even though they had the opportunity to do so.

667. The Defendants and/or their employees/agents are liable because the violation of Plaintiffs and the Arrest and Prosecution Subclass' members rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

668. The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and Subclass members' rights.

669. The Defendant City is liable because the violation of Plaintiffs' and Subclass members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant City and the CPD in that the violation of Plaintiffs and the Arrest and Prosecution Subclass' members rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

670.    In the manner described more fully above, the need for policies, training, and supervision of officers on how to address prosecutions as describe in this Count was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

671.    The widespread practices were so well settled as to constitute *de facto* policy in the City and CPD, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

672.    As a direct and proximate result of Defendants' actions, Plaintiffs' and Subclass members' constitutional rights were violated, entitling them to relief.

673.    Defendants are jointly and severally liable for this conduct.

## COUNT 7
## 42 U.S.C. § 1983 – Fourteenth Amendment: Conditions of Confinement against All Defendants

674.    All of the foregoing paragraphs are incorporated as though fully set forth here.

675.    At all times relevant to this Count, Plaintiffs and the Conditions of Confinement Subclass' members were pretrial detainees.

676.    In the manner described more fully above, Defendants and their employees/agents caused Plaintiffs and the Conditions of Confinement Subclass' members to suffer unconstitutional conditions of confinement, in violation of their rights under the Fourth and Fourteenth Amendments to the United States Constitution, and subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this complaint.

677.    The conduct of Defendants and their employees/agents violated Plaintiffs' and the Conditions of Confinement Subclass' members' basic human rights and dignity, and their right to be free from unconstitutional conditions of confinement, cruel and unusual punishment, and unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

678.    Further, during the constitutional violations described in this Count, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' and the Conditions of Confinement Subclass members' constitutional rights, even though they had the opportunity to do so.

679.    Defendants and their employees/agents were aware of the unconstitutional and dangerous conditions of confinement in which Plaintiffs and the Conditions of Confinement Subclass' members were held, and unreasonably instituted and/or condoned such conditions and/or were deliberately indifferent to the inhumane conditions and violations of law and the substantial risk of serious harm and actual harm to Plaintiffs and the Conditions of Confinement Subclass' members.

680.    Defendants and their employees/agents failed to prevent and caused Plaintiffs and the Conditions of Confinement Subclass' members mental and physical injuries and pain.

681.    The Defendants and/or their employees/agents are liable because the violation of Plaintiffs and the Conditions of Confinement Subclass' members rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

682.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City and/or Defendant County. The policies, practices, and customs of the Defendant City and/or Defendant County were the

moving force behind the misconduct described in this Count and the violation of Plaintiffs' and Subclass members' rights.

683. The Defendant City and/or Defendant County is liable because the violation of Plaintiffs' and Subclass members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City and/or County. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant City and/or Defendant County in that the violation of Plaintiffs and the Conditions of Confinement Subclass' members rights described in this Count was committed by the relevant final policymaker for the City and/or County, or the persons to whom final policymaking authority had been delegated.

684. In the manner described more fully above, the need for policies, training, and supervision of officers on how to address prosecutions as describe in this Count was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City and/or Defendant County can reasonably be said to have been deliberately indifferent to the need.

685. The widespread practices were so well settled as to constitute *de facto* policy in the City and/or County, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

686. As a direct and proximate result of Defendants' actions, Plaintiffs' and Subclass members' constitutional rights were violated, entitling them to relief.

687. Defendants are jointly and severally liable for this conduct.

**COUNT 8**
**42 U.S.C. § 1983 – Supervisory Liability**
**against the Individual Defendants**

688.    All of the foregoing paragraphs are incorporated as though fully set forth here.

689.    The constitutional injuries complained of in this Complaint were proximately caused by (i) the intentional misconduct of these supervisory Defendants, and/or (ii) by these supervisory Defendants being deliberately and recklessly indifferent to their subordinates' misconduct, knowing that ignoring that misconduct would necessarily violate the constitutional rights of Plaintiffs, the members of the First Amendment Violations Class, and the members of the Arrest and Prosecutions, Conditions of Confinement, use of Force, and Property Seizure Subclasses.

690.    Specifically, these supervisory Defendants were aware of and facilitated, condoned, and oversaw the unconstitutional conduct by other Defendants and/or their employees/agents as described more fully above.

691.    As a direct and proximate result of the actions of the supervisory Defendants, the constitutional rights of Plaintiffs, the members of the First Amendment Violations Class, and the members of the Arrest and Prosecutions, Conditions of Confinement, use of Force, and Property Seizure Subclasses were violated.

692.    Further, during the constitutional violations described in this Count, one or more of these Defendants stood by without intervening to prevent the violation of Plaintiffs' and Class and Subclass members' constitutional rights, even though they had the opportunity to do so.

693.    The Defendants and/or their employees/agents are liable because the violations of the constitutional rights of Plaintiffs, the members of the First Amendment

Violations Class, and the members of the Arrest and Prosecutions, Conditions of Confinement, use of Force, and Property Seizure Subclasses as described in this Complaint were caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

694.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City and/or Defendant County. The policies, practices, and customs of the Defendant City and/or Defendant County were the moving force behind the misconduct described in this Count and in this Complaint and the violations of Plaintiffs' and Class and Subclass members' rights.

695.    The Defendant City and/or Defendant County is liable because the violations of Plaintiffs' and Class and Subclass members' rights as described in this Count and in this Complaint were caused by the policies, practices, or customs of the relevant policymakers for the City and/or County. In addition, this misconduct was undertaken pursuant to the policy and practices of the Defendant City and/or Defendant County in that the violations of Plaintiffs' and Class and Subclass' members rights were committed by the relevant final policymaker for the City and/or County, or the persons to whom final policymaking authority had been delegated.

696.    In the manner described more fully above, the need for policies, training, and supervision of officers on how to address exercise supervisory roles as describe in this Count was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City and/or County can reasonably be said to have been deliberately indifferent to the need.

697.    The widespread practices were so well settled as to constitute *de facto* policy in the City and/or County, and they were allowed to exist because municipal policymakers

with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

698. As a direct and proximate result of Defendants' actions, Plaintiffs' and Class and Subclass members' constitutional rights were violated, entitling them to relief.

699. Defendants are jointly and severally liable for this conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek judgment as follows:

700. An order certifying each Class and Subclass defined herein pursuant to the Federal Rules of Civil Procedure 23(b)(2) and (3);

701. An order appointing the named Plaintiffs as Class and Subclass representatives and their undersigned counsel as class counsel;

702. A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining court jurisdiction to enforce the terms of the injunction;

703. A declaratory judgment that Defendants' conduct detailed herein was a violation of the rights of the Plaintiffs and Class and Subclass members under the United States Constitution;

704. General and compensatory damages for Plaintiffs and the Class and Subclasses they represent for the violations of their federal constitutional rights, pain and suffering;

705. Punitive damages for Plaintiffs based on the actions of the Individual Defendants.

706. An award of attorneys' fees pursuant to 42 U.S.C. § 1988, and costs;

707. Pre- and post-judgment interest as permitted by law;

708. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(c) on all issues so triable.

Respectfully submitted,

*/s/ J. Robert Linneman*
J. Robert Linneman (0073846)
Brian P. O'Connor (0086646)
H. Louis Sirkin (0024573)
SANTEN & HUGHES
600 Vine Street, Suite 2700
Cincinnati, Ohio 45202
T: (513) 721-4450
F: (513) 852-5994
jrl@santenhughes.com
bpo@santenhughes.com
hls@santenhughes.com

*/s/ Jacqueline Greene*
Jacqueline Greene (0092733)
Sarah Gelsomino (0084340)
Alphonse A. Gerhardstein (0032053)
FRIEDMAN GILBERT + GERHARDSTEIN
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
T: (513) 572-4200
F: (216) 621-0427
jacqueline@FGGfirm.com
sarah@FGGfirm.com
al@FGGfirm.com

*Counsel for Class*
Dated: May 26, 2022

# City of Cincinnati



**Mayor John Cranley**

Office of Mayor John Cranley

801 Plum Street, Suite 150
Cincinnati, Ohio 45202
Phone   (513) 352-3250
Fax       (513) 352-5201
Email: John.Cranley@cincinnati-oh.gov

### Emergency Order

Upon consultation with and at the request of the City Manager and Chief of Police, and based upon the emergency declaration currently existing in the City of Cincinnati, which declaration pursuant to Article III of the City Charter was approved by the City Council, and pursuant to Article XVIII of the Administrative Code of the City of Cincinnati, I hereby order the implementation of a curfew from 10 p.m. to 6 a.m. in designated neighborhoods of the City of Cincinnati. The need for this order arises from destruction and violence in several areas of the City of Cincinnati, on May 29, 2020 through May 30, 2020; the threat of continued and escalating violence; the need for security and enforcement support for the Cincinnati Police Department; and the need to protect the City's first responders from the spread of COVID-19. These conditions presently constitute a clear and present danger to the health, safety, and property of the citizens of Cincinnati and may require enhanced enforcement authority and security resources to protect the lives and property of those who live, work, and do business in Cincinnati.

Individuals are prohibited from appearing in the public spaces of the City of Cincinnati neighborhoods of Over-the-Rhine, the Central Business District/Downtown, the Banks, and the West End during the period of the curfew. This order is inapplicable to City of Cincinnati officials, members of the public safety forces, emergency personnel, health care professionals, essential workers, people experiencing homelessness, and local government officials engaged in their lawful duties.

This order shall be effective at 1 p.m. on this 30th day of May, 2020, and shall terminate at 6 a.m. on the 1st day of June, 2020. This order shall be issued to the news media for the widest possible dissemination to the citizens of Cincinnati.

Mayor John Cranley

**Exhibit 1 - First Emergency Order**

# City of Cincinnati



Mayor John Cranley

Office of Mayor John Cranley

801 Plum Street, Suite 150
Cincinnati, Ohio 45202
Phone   (513) 352-3250
Fax       (513) 352-5201
Email: John.Cranley@cincinnati-oh.gov

## Emergency Order

Upon consultation with and at the request of the City Manager and Chief of Police, and based upon the emergency declaration currently existing in the City of Cincinnati, which declaration pursuant to Article III of the City Charter was approved by the City Council, and pursuant to Article XVIII of the Administrative Code of the City of Cincinnati, I hereby order the implementation of a curfew from 10 p.m. to 6 a.m. in designated neighborhoods of the City of Cincinnati. The need for this order arises from destruction and violence in several areas of the City of Cincinnati, on May 29, 2020 through May 30, 2020; the threat of continued and escalating violence; the need for security and enforcement support for the Cincinnati Police Department; and the need to protect the City's first responders from the spread of COVID-19. These conditions presently constitute a clear and present danger to the health, safety, and property of the citizens of Cincinnati and may require enhanced enforcement authority and security resources to protect the lives and property of those who live, work, and do business in Cincinnati.

Individuals are prohibited from appearing in the public spaces of the City of Cincinnati neighborhoods of Over-the-Rhine, the Central Business District/Downtown, the Banks, Pendleton, and the West End during the period of the curfew. This order is inapplicable to City of Cincinnati officials, members of the public safety forces, emergency personnel, health care professionals, essential workers, people experiencing homelessness, and local government officials engaged in their lawful duties.

This order shall be effective at 1 p.m. on this 30th day of May, 2020, and shall terminate at 6 a.m. on the 1st day of June, 2020. This order shall be issued to the news media for the widest possible dissemination to the citizens of Cincinnati.

Mayor John Cranley

Equal Opportunity Employer

**Exhibit 2 - First Emergency Order - Pendleton Version**

# City of Cincinnati



**Mayor John Cranley**

Office of Mayor John Cranley

801 Plum Street, Suite 150
Cincinnati, Ohio 45202
Phone   (513) 352-3250
Fax       (513) 352-5201
Email: John.Cranley@cincinnati-oh.gov

### Emergency Order

Upon consultation with and at the request of the City Manager and Chief of Police, and based upon the emergency declaration currently existing in the City of Cincinnati, which declaration pursuant to Article III of the City Charter was approved by the City Council, and pursuant to Article XVIII of the Administrative Code of the City of Cincinnati, I hereby order the implementation of a curfew from 9 p.m. to 6 a.m. in the City of Cincinnati.  The need for this order arises from destruction and violence in several areas of the City of Cincinnati, on May 29, 2020 through May 31, 2020; the threat of continued and escalating violence; the need for security and enforcement support for the Cincinnati Police Department; and the need to protect the City's first responders from the spread of COVID-19.  These conditions presently constitute a clear and present danger to the health, safety, and property of the citizens of Cincinnati and may require enhanced enforcement authority and security resources to protect the lives and property of those who live, work, and do business in Cincinnati.

Individuals are prohibited from appearing in the public spaces of the City of Cincinnati during the period of the curfew. This order is inapplicable to City of Cincinnati officials, members of the public safety forces, emergency personnel, health care professionals, essential workers, people experiencing homelessness, and local government officials engaged in their lawful duties.

This order shall be effective at 1 p.m. on this 31st day of May, 2020, and shall terminate at 6 a.m. on the 2nd day of June, 2020.  This order shall be issued to the news media for the widest possible dissemination to the citizens of Cincinnati.

_____
Mayor John Cranley

**Exhibit 3 - Second Emergency Order**

Equal Opportunity Employer

# City of Cincinnati



**Mayor John Cranley**

Office of Mayor John Cranley

801 Plum Street, Suite 150
Cincinnati, Ohio 45202
Phone   (513) 352-3250
Fax       (513) 352-5201
Email: John.Cranley@cincinnati-oh.gov

## Emergency Order

Upon consultation with and at the request of the City Manager and Chief of Police, and based upon the emergency declaration currently existing in the City of Cincinnati, which declaration pursuant to Article III of the City Charter was approved by the City Council, and pursuant to Article XVIII of the Administrative Code of the City of Cincinnati, I hereby order the implementation of a curfew from 11 p.m. to 6 a.m. in the City of Cincinnati.  The need for this order arises from destruction and violence in several areas of the City of Cincinnati, on May 29, 2020 through June 3, 2020; the threat of continued and escalating violence; the need for security and enforcement support for the Cincinnati Police Department; and the need to protect the City's first responders from the spread of COVID-19.  These conditions presently constitute a clear and present danger to the health, safety, and property of the citizens of Cincinnati and may require enhanced enforcement authority and security resources to protect the lives and property of those who live, work, and do business in Cincinnati.

Individuals are prohibited from appearing in the public spaces of the City of Cincinnati during the period of the curfew. This order is inapplicable to City of Cincinnati officials, members of the public safety forces, emergency personnel, health care professionals, essential workers, people experiencing homelessness, and local government officials engaged in their lawful duties.

This order shall be effective at 12 p.m. on this 3rd day of June, 2020, and shall terminate at 6 a.m. on the 8th day of June, 2020.  This order shall be issued to the news media for the widest possible dissemination to the citizens of Cincinnati.

Mayor John Cranley

**Exhibit 4 - Third Emergency Order**

Equal Opportunity Employer

2917.13 MISCONDUCT AT AN EMERGENCY
[M1]

CASE NO. 20 BIC0068

**ARRESTED**
THE DEFENDANT HEREIN
WAS PHYSICALLY ARRESTED
DATE _____

**COMPLAINT**
**HAMILTON COUNTY MUNICIPAL COURT**

STATE OF OHIO vs

(Name)

(Address)

D128888764

MASS ARREST PROPER

PO V. BEST _____, being first duly cautioned and sworn, deposes and says that

on or about 5·30·20 , in Hamilton County, State of Ohio,

did fail to obey the lawful orders of a law enforcement officer engaged in

his/her duties at the scene of an emergency declared by the Mayor of Cincinnati, contrary to and in violation of

Section 2917.13 of the Revised Code of Ohio, a 1st degree misdemeanor.

The complainant states that this complaint is based on the following:

On May 30, 2020, the Mayor of the City of Cincinnati enacted a curfew from 10pm-6am, effective May 30, 2020, at 1pm, terminating at 6am, June 1, 2020. The order was issued through widespread media dissemination. The purpose of this emergency declaration was to abate the destruction and violence associated with illegal rioting in response to law enforcement personnel. In the late hours of May 29, 2020, through the early hours of May 30, 2020, rioters destroyed property, looted businesses, and attacked Cincinnati Police officers.

The arrested individual identified above was found by Cincinnati Police to be violating the curfew order. The arrested was ordered by Cincinnati Police to leave the property. The arrested individual refused to comply with the lawful order to leave the area. The curfew order was in response to and declared under emergency conditions. Violating the curfew order enhances/prolongs the emergency situation created by ongoing risk of illegal violence and property damage.

Sworn to and subscribed David R. Simpson 1, MAY, 2020
Notary Public, State of Ohio
My Commission Expires 09-05-2020

Not needed for court

(Complainant)

Public/ Deputy Clerk/ Judge

Filed 5/31/2020
AFTAB PUREVAL
(Clerk of Hamilton County Municipal Court)

CIS / Mom

(Address)

By _____
Deputy Clerk

PO Condon P329 needed for court

* "hamper the lawful operation" or "fail to obey the lawful orders"
** "law enforcement officer" or "firefighter" or "rescuer" or "medical person" or "emergency medical service person"
*** "fire" or "accident" or "disaster" or "riot" or "emergency of any kind"
**** a minor misdemeanor or if the offender creates a risk of physical harm to persons or property, a 1st degree misdemeanor

**Exhibit 5 - Sample Criminal Complaint**



VERIFY RECORD

20/CRB/10275    ABRAMS/MICHAEL
COURT DATE:04/13/21 AT 9:00 AM IN ROOM 154 COURTHOUSE    MO    JBOC

HAMILTON COUNTY MUNICIPAL COURT
CRIMINAL DIVISION
HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| CITY OF CINCINNATI STATE OF OHIO | ) ) ) | CASE NO.: 20/CRB/10275 |
| Plaintiff | ) ) | JUDGE BERKOWITZ |
| -vs- | ) ) ) | |
| MICHAEL ABRAMS | ) ) | **State's Response to Defendant's Motion to Compel** |
| Defendant | ) | |

Now comes Plaintiff, City of Cincinnati, State of Ohio, and responds to Defendant's Motion to Compel.[1] The State is compelled by rules of professional responsibility to respond to the Court with candor concerning its current findings on the technical and practical limits of the State's ability to comply with Defendant's discovery requests. This response to the Motion is offered only after a sustained effort by the State to identify a technical or resource-based solution to the logistical and technical obstacles at issue. The simultaneous combination of new policies promoting widespread body worn camera (BWC) usage, state records laws, discovery rules applicable to BWC footage, a 500+ person mass arrest scenario, and a global pandemic together create a perfect storm. Despite the effort on the part of the State (including by the Cincinnati police and prosecuting attorneys) to overcome

---

[1] The State fully recognizes that each individual case, discovery request, and pending motion to compel present slightly different facts and issues for the Court's consideration. But given the number of cases pending, the challenges to complying with discovery as requested within an appropriate timeframe are systemic. Thus, the State is filing this response in each currently-pending curfew violation case.



D131597261
Exhibit 6 - State's Response to Motion to Compel

the resulting technical challenge, pending hearings on this and similar Motions to Compel lead the State to a regrettable conclusion: it cannot satisfy each of the many individually tailored discovery demands within a timeframe that would be acceptable to the Court or consistent with speedy trial requirements. Given this information, the State respectfully requests that the Court determine whether the cases can proceed given these technological barriers to production.

**Background**

The summer of 2020 presented an unprecedented layering of emergencies for the Cincinnati area. Of course, the COVID-19 pandemic necessitated a series of emergency public health and safety actions including large-scale shutdowns and stay-at-home orders across the State of Ohio and the City of Cincinnati. Courthouse operations were severely curtailed, and many employees in the City Prosecutor's Office and Cincinnati Police Records section had to be placed on temporary emergency leave. Uncertainty and public apprehension about COVID-19 were at all-time highs as people struggled to learn about and understand the personal, professional, and social implications of the global pandemic.

At the same time, our society was experiencing a reckoning about race relations and police use of force. Hundreds of Cincinnatians protested peacefully so that their voices could be heard. But, sadly, there were also troubling and tragic instances of rioting: widespread damage to businesses and property downtown and acts of violence like when a police officer was shot in his ballistic helmet, miraculously evading harm. The City leadership enacted limited curfews to restore order, protect people and property, and prevent the spread of COVID-19 in late May

2

Exhibit 6 - State's Response to Motion to Compel

and early June 2020. Over the course of this unrest, all of CPD's sworn force responded to dozens of locations and interacted with hundreds of people who violated the curfew.

Some people did not adhere to the curfew, and so they were arrested. This case, along with 500 other curfew cases associated with this civil unrest were filed in the Hamilton County Municipal Court. Not only do these cases involve 500 defendants, but they also involve body worn camera footage from hundreds of Cincinnati Police officers. Approximately 1200 BWC videos were captured in connection with the unrest. These videos contain over 12,000 minutes (over 200 hours) of footage taken at 49 locations spanning a period of six days.

**Procedural Posture**

In general, counsel for defendants filed discovery requests on these cases in July 2020. As is usual, the requests cover substantially all of the evidence categories delineated in Ohio Criminal Rule 16, including reports, statements, tangible objects, and all video.

Because of how BWC footage is logged and the process used to arrest the defendants, linking BWC footage to any individual defendant was not feasible absent an in-person review of all the available footage. Instead, prosecutors worked with CPD Records to catalog and organize the BWC footage organized by location. This footage, which was unredacted, was produced in October 2020. The location-based evidence linked defendants to officers and incidents in the most general location terms, but admittedly did not link BWC videos for primary officers to each defendant.

3

Exhibit 6 - State's Response to Motion to Compel

Counsel for the defendants in general objected that this production did not satisfy the State's obligations as it did not provide redacted, individualized video for each defendant. On top of this, they objected broadly to the retention of the "Counsel Only" designation. This response created logistical and legal problems for the State. First, the State cannot simply remove the "Counsel Only" (Crim.R. 16(C)) designation and allow defense attorneys to share unreviewed and unredacted video with their clients until the video is reviewed for confidential material, particularly Law Enforcement Automated Database System (LEADS) information or social security numbers. *See* R.C. 2913.04 and R.C. 5503.10. The State recognizes that many hours of the footage will not contain this information; yet, the review has to be done before the "Counsel Only" designation can be removed.

Second, because of how the BWC footage is categorized and maintained, linking BWC videos from primary officers to particular defendants cannot be done utilizing technology, rather it is a manual process. Through the end of 2020 and early 2021, City staff engaged in countless hours of additional review to sort the footage. The State then provided defendants with additional discovery in the form of hundreds of new digital cases containing BWC videos linking primary officers to defendants. The bulk of these new digital cases have been provided to defense attorneys without restriction, but several dozen of the cases contain videos that must be redacted, a task that is still in progress. Moreover, despite best efforts, for over 60 cases it was simply not possible to isolate videos linking primary officers to defendants.

4

Exhibit 6 - State's Response to Motion to Compel

In response to this next production, counsel for defendants generally filed supplemental motions to compel or made additional requests in Court. These requests included naming the officers captured in the produced BWC, naming the witnesses present at the scene, and producing the BWC footage of officers captured by the video produced. But again, the video is not stored or organized in a way that permits for this type of production absent a manual viewing of all the footage. Additionally, although defendants' statements in the State's possession are contained within the BWC footage produced, defendants' counsel have argued that the State must identify *where* in the footage the statements exist. And as the BWC is not organized by defendant, this task is impossible to complete within an appropriate timeframe.

In sum, the volume of BWC requests, the number of arrests (more than 500), and the lack of a technical means of sorting the BWC footage by individual created a perfect storm of BWC records for the City. Cincinnati—like other jurisdictions—faced the new logistical and technical challenges created by the huge volume of BWC video and public records arising out of a mass arrest scenario for the first time since the establishment of widespread body-worn camera usage. [2]

Unfortunately, the State cannot reasonably estimate that the time required to determine which of the original 1200 BWC videos were not included in the new digital cases and to sort, review, and redact the videos that were not included in order to remove the "Counsel Only" designation from all videos comports with the

---

[2] *See* https://wdet.org/posts/2021/01/14/90511-judge-dismisses-cases-against-28-detroit-black-lives-matter-protesters/. *See also* https://www.nytimes.com/2020/11/19/us/protests-lawsuits-arrests.html.

Exhibit 6 - State's Response to Motion to Compel

Court's requirements or the defendant's right to a speedy trial. It easily requires hundreds of hours to sort, review, trace, and redact the requests. Even then, the State would still be very far away from identifying all the videos associated with each defendant. It is the State's understanding that the defendant's request and the Court's expectation is that the State provide individualized videos of this mass arrest scenario. Providing individualized production of the State's BWC from the days in question would require the State to conduct a manual, moment-by-moment analysis of each of the 1200 videos to identify all the officers who were on scene for each incident, followed by assembly of all the BWC videos for each of those officers. These tasks would take hundreds if not thousands of hours and are simply beyond the ability of prosecutors and CPD Records to accomplish within an appropriate amount of time. Such is the current reality of mass arrests in a digital age given the limitations of current software. [3]

**Legal Analysis**

The City simply cannot produce the discovery as requested by defendants and required by the Court in this case or the cases of the similarly situated defendants within the required timeframe. The City has exhausted every technological solution to meet these demands. There are simply too many cases, too many officers, and too many videos to permit identification, review, and redaction of all the videos for each defendant within any reasonable period of time. As noted above, other jurisdictions

---

[3] Prosecutors and CPD have initiated a new mass arrest process with the goal of avoiding the difficulties encountered in processing BWC video and other evidence in this mass arrest situation.

6

Exhibit 6 - State's Response to Motion to Compel

have confronted similar cases and issues involving the State's lack of ability to respond to discovery demands for BWC video in mass arrest situations.

Although time has been tolled for months due to defendant's motion to dismiss, time will begin running against the State soon, and we feel compelled by our professional obligations to be candid with the Court about the limits of our abilities at this time. The 45 speedy trial days for a misdemeanor of the fourth degree will run before the State could complete the discovery tasks set forth above, even if discovery on these cases is prioritized above all other pending criminal and traffic cases the City is required to prosecute.

WHEREFORE, for the foregoing reasons, the State moves the Court to issue an order on the Motion to Compel and determine whether the cases may proceed given that the State cannot comply with discovery and the Motion to Compel.

Respectfully Submitted,

**ANDREW GARTH**
City Solicitor

s/*William T. Horsley*
William T. Horsley (0072016)
Chief Prosecuting Attorney
801 Plum Street, Room 226
Cincinnati, OH 45202
Telephone: 513-352-1502
Fax: 513-352-5217
Email: william.horsley@cincinnati-oh.gov

7

Exhibit 6 - State's Response to Motion to Compel

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document was served upon Defendant's counsel, Sean Vicente, by email transmission to svicente@cms.hamilton-co.org, on this 6th day of March, 2021.

s/*William T. Horsley*
William T. Horsley (0072016)
Chief Prosecuting Attorney

8

Exhibit 6 - State's Response to Motion to Compel